[No. S122240. Jan. 24, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
CATARINO GONZALEZ, JR., Defendant and Appellant.

## COUNSEL

Sylvia Whatley Beckham, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Scott A. Taryle, Donald E. De Nicola, Linda C. Johnson and James William Bilderback II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MORENO, J.— In *Davis v. United States* (1994) 512 U.S. 452 [129 L.Ed.2d 362, 114 S.Ct. 2350] (*Davis*), the United States Supreme Court held that a defendant's invocation of the right to counsel during custodial interrogation, safeguarded by *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*), must be unambiguous and unequivocal to be valid. In the present case, defendant said, before submitting to a polygraph examination during a custodial interrogation, "if for anything you guys are going to charge me I want to talk to a public defender too, for any little thing." The police assured him he could talk to a public defender "anytime you want to," but explained they planned to "book" him that night and would release him the following day if the polygraph examination showed he was telling the truth about his involvement in the murder that police suspected him of having committed. The interrogation continued that evening and the following day. Defendant ultimately confessed to the crime.

The Court of Appeal concluded defendant's statement was a "sufficiently clear" request for counsel and that, at a minimum, the police should have asked defendant to clarify whether he wanted an attorney. We disagree. For the reasons that follow, we conclude that defendant's statement was ambiguous and equivocal and that the police were not required to ask clarifying questions to determine his intent.

## STATEMENT OF FACTS

Defendant Catarino Gonzalez, Jr., was convicted, following a jury trial, of the first degree murder of Los Angeles Police Officer Filbert Cuesta (Pen. Code, § 187, subd. (a)) with the special circumstances that the victim was engaged in the performance of his duties as a peace officer at the time of the murder, that the murder was committed to avoid a lawful arrest, and that it was committed by means of lying in wait (Pen. Code, § 190.2, subd. (a)(5),

(7), & (15)).[1] Defendant was also convicted of the premeditated attempted murder of Officer Richard Gabaldon. The jury also found true various sentence enhancements for firearm use. (§§ 12022.5, subd. (a), 12022.53, subds. (c), (d), & (e)(1).) Following the penalty phase of the trial, the jury fixed the penalty for the murder of Officer Cuesta at life without the possibility of parole. Defendant was sentenced to that term consecutive to a term of 25 years to life for using a firearm. On the attempted murder count, defendant was sentenced to a consecutive term of 15 years to life, consecutive to a term of 20 years to life for using a firearm.

The evidence introduced at trial showed the following: In April 1998, defendant was a member of the Smiley Hauser clique of the 18th Street gang and went by the moniker "Termite." Officer Cuesta and his partner, Gary Copeland, were members of a gang unit and monitored the Smiley Hauser clique. Over the preceding two-year period, the two officers had stopped and talked to defendant two or three times a week. On April 1, Officers Cuesta and Copeland participated in the arrest of defendant for possession of rock cocaine. Defendant was convicted and sentenced to probation, including a term in county jail. As a condition of probation, defendant was prohibited from associating with gang members. After he was released from county jail, defendant adopted a more confrontational attitude toward police, including Officers Cuesta and Copeland.

On August 3, 1998, Officer Copeland detained defendant for drinking in public. Defendant was taken to the police station, where he was cited and released. When Officer Copeland declined to give him a ride home, defendant became upset and called Copeland a "punk ass bitch." The following day, while on patrol, Officer Copeland observed freshly painted gang graffiti that read "T. Mite," and "18th St T.M.L.S." and had the word "police" crossed out. This indicated to Copeland that the author of the graffiti intended to retaliate against, and possibly kill, a police officer. Copeland believed defendant was the author.

On August 8, Copeland called Officer Cuesta and told him about the graffiti. When Officer Cuesta began his shift that night, he told his partner, Officer Richard Gabaldon, that he believed the graffiti was grounds to revoke defendant's probation.

That night, defendant and other members of the 18th Street gang appeared uninvited at a wedding reception on Carlin Street. Defendant was seen showing a gun to some girls. Shortly after midnight, while on patrol, Officers Cuesta and Gabaldon saw several individuals whom they believed to be gang

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

members going into the party, and stopped to investigate. About the same time, defendant and other gang members left the party through a back gate.

Officer Cuesta spoke to the hostess of the party, Maria Guzman, who complained about the uninvited gang members and wanted the party to end. The officers told her the party was too loud, that there were too many people and she would have to close it down. She told the police she doubted anyone would leave as long as they remained out front. Officer Cuesta suggested to Gabaldon that they drive around the block so that it would appear they were leaving. Officer Cuesta drove around the block and parked on Westhaven Street behind the party. The officers wanted to see if people from the party were climbing over the back fence. Gabaldon called for backup to assist in breaking up the party.

Cuesta continued around the block before parking at the intersection of Du Ray and Carlin Streets, three or four buildings east of the party. As Officer Gabaldon was getting out the car, he heard gunfire coming from behind him, a total of 12 to 15 shots fired in rapid succession. He got back into the car and slid down in his seat. Officer Cuesta yelled an epithet. The rear windshield was shot out and the car began to roll forward, then turned sharply left and hit a parked car. Officer Gabaldon looked over at his partner; Cuesta was slumped forward, his head resting on his chest; he was bleeding uncontrollably from a gunshot wound to his head. Gabaldon got out of the car with his weapon drawn and looked in the direction from which the shots had been fired. He saw three or four men running from the corner and fired at them.

Two eyewitnesses saw the shooting and both identified defendant as the shooter. The first, Agipato Negron, another 18th Street gang member, had been at the party with defendant. Negron saw defendant pull out a gun and start firing straight at the police car. The second eyewitness, Sylvia Thomas, lived in an apartment building on Cochran Street near the intersection of Carlin Street. She was standing on the balcony of her apartment shortly after midnight and saw a police car parked on Carlin with two officers inside. She noticed three men walking down Cochran Street toward Carlin. She recognized them as three men she had seen earlier that evening while warming up her car before driving her sister to work. One of the men was defendant. She saw defendant step forward, raise his hands and start shooting. She had no doubt the shooter was defendant because she watched to see the expression on his face as he fired and he "didn't look like he had feelings while he was doing it."

After the shooting stopped, defendant and the other two men ran from the scene. The following evening, police, led by Detective Richard Henry,

executed a search warrant at the home of defendant's sister and brother-in-law, Araceli and Joel Loza, based on information that defendant had gone to their residence after the shooting. Police found an identification card bearing defendant's name, letters written to him that addressed him as "Termite," and 154 rounds of various brands of nine-millimeter ammunition in a shed behind the house.

The following day, Detective Henry spoke to the Lozas and told them he wanted to talk to defendant about Officer Cuesta's murder. Loza brought defendant to police headquarters on August 11, 1998. At Loza's request, defendant was photographed to show that he had no injuries before speaking to police.

Defendant was interviewed that day by Detectives Henry and Aldahl. After defendant waived his rights, he admitted he had been at the party but maintained that he had not shot Officer Cuesta. He told the detectives that, when the shooting began, he jumped over the back gate and ran away, eventually ending up at his sister and brother-in-law's house, where he remained until the next morning. He told them he fled the scene because he was afraid his probation would be violated for associating with gang members. In order to reconcile inconsistencies between defendant's denials and evidence that he had been involved in the shooting, Detective Aldahl asked defendant whether he would be willing to take a lie detector test. Defendant agreed.

At this point, Detective Aldahl asked, "You're willing to do it?" Defendant replied, "That um, one thing I want to ask you to that, if for anything you guys are going to charge me I want to talk to a public defender too, for any little thing. Because my brother-in-law told me that if they're trying to charge you for this case you might as well talk to a public defender and let him know cause they can't [Untranslatable]." Aldahl told defendant, "Well, you can do that anytime you want to. [¶] The thing is, that—that we're going to book you tonight." Defendant said, "Yeah?" Aldahl replied, "If that's okay? And if you come out—if you come out telling the truth tomorrow, we'll let you go." Defendant asked, "Book me on what?" Aldahl said, "On murder. That doesn't mean you're going to be filed on. That doesn't mean you're going to be filed on, okay?"

Detective Henry explained that "based on what we have right now, we're just going to book you tonight for the murder." He told defendant, however, that if the polygraph results indicated defendant was being truthful, "We want to do some more investigation on this." Furthermore, he said, "[j]ust because we say we're booking you for this murder, doesn't mean you're getting violated, and going to do that five years you're so worried about either, all

right?" Defendant said, "Yes, sir." Somewhat later in the conversation, Detective Henry also told defendant, "[A]n arrest is not a prosecution; you hear me?" Defendant replied, "Yes, sir." After some further, nonsubstantive conversation, the interrogation ended and defendant was housed overnight in a cell.

The issue of a public defender came up again the following day as defendant was being interrogated by the polygraph examiner, Ervin Youngblood. At the outset of the interrogation, Youngblood asked defendant whether he had been advised of, and had waived, his rights the previous day. Defendant said he had. Youngblood then asked him whether he was "waiving your rights here today to talk to me also?" Defendant replied, "Yes, sir." Just before defendant took the test, he said, "Sir, I was going to ask you that, is there any, like—cause they told me about a public defender." Youngblood replied, "What about a public defender?" Defendant said, "They said that he would show up for anything." Youngblood told him, "Oh, you have a right to a public defender. That's why I asked you did they—they told you about your rights." Defendant replied, "They read my rights, yeah." There was no further mention of a public defender.

After defendant admitted to Youngblood he had shot Officer Cuesta, defendant was again interrogated by Detective Aldahl. He repeated his admissions to Aldahl. Toward the end of the interrogation, he said, "I don't have no public defender." Aldahl replied, "You didn't get one? You didn't get one," but was interrupted by another detective on a unrelated matter. Following the interruption, Aldahl said, "All right. What were you saying? You said something about a public defender?" Defendant said, "Yeah." Aldahl told him. "You can have one any time you want, man. I told you that when I first advised you." Defendant said, "Yeah, but already a lot of things went by, and I haven't had a public defender." Aldahl said, "You want one right now? I mean, if that's the thing, then we're [done] talking. And I'm out of here." Defendant said, "Really?" Aldahl told him, "I can't talk to you until you talk to this—whoever you're going to talk to, so it's up to you. [¶] I'm just looking for some answers to the blanks here. I already know what happened. I know where you were standing from [where] you shot. I know what distance it was. You know, I've got all the evidence from this crime scene. [¶] I just need to know what your intent was. You've already said you wanted to scare the cop, the police; right?" Defendant said, "My intent wasn't to kill him. My intent wasn't to hit a cop."

Following the police interrogation, defendant met with his mother in the presence of Detective Garcia. He told his mother he was not the shooter and that police were lying when they said he was. After she left, however, he again admitted to having shot Officer Cuesta.

Before trial, defendant moved to suppress statements he made to the police on grounds that the statements were taken in violation of *Miranda* and were involuntary. At the hearing on the motion, four police officers testified that each one of them had arrested defendant on a prior occasion, and on each occasion he had been advised of his *Miranda* rights. On two of those occasions he waived his rights and spoke to the police. On the third occasion, after he was given his rights, he was not asked any further questions, though the officer's report was unclear as to whether he had invoked his right to counsel. On the fourth occasion, defendant asserted his right to counsel and was not questioned further.

Both Detectives Henry and Aldahl also testified, as did the polygraph examiner, Youngblood. Detective Henry testified that he understood defendant's reference to a public defender to mean defendant had been told by his brother-in-law if "he was charged with a crime, did he want to have the services of a public defender." He testified further that he and Aldahl had explained to defendant the distinction between being charged with a crime and being arrested. Finally, he testified that he did not believe defendant's reference to a public defender meant that defendant was requesting an attorney at that moment. Aldahl testified to the same effect, "He never asked for an attorney. [¶] He mentioned a public defender. But he never asked for one." He testified further that, during the final interrogation, when defendant raised the subject of a public defender and the transcript showed Aldahl's reply—"You didn't get one?"—the transcript erroneously showed it as a question. Aldahl said his reply was a statement, not a question. Finally, Youngblood testified that he did not interpret defendant's reference to a public defender to be a request for an attorney. "He appeared to be reaffirming that he did have a right to have an attorney if he wanted one, which I let him know that he did."

In denying defendant's motion, the trial court, citing *Davis*, concluded that defendant's references to counsel were ambiguous. The trial court characterized defendant as "an experienced person in terms of contact with the police," and observed that on a prior occasion he had invoked his right to counsel. Furthermore, the trial court noted that, under *Davis*, the police were not required to ask clarifying questions. Accordingly, the trial court concluded: "This defendant well knew his *Miranda* rights even though he never had been suspected of killing a police officer. He had many contacts with the police. He knew what his rights were. There was ample opportunity during this interview for him to say, hey, that is it, I don't want to talk to you guys anymore. He never said that in a clear fashion as I believe required by the authorities."

The Court of Appeal reversed. It found that defendant had "adequately" invoked his right to counsel after having initially waived his rights. The Court of Appeal additionally held that police should have asked defendant to clarify whether he wanted an attorney present.[2] The Court of Appeal found, further, that the error in admitting defendant's statement was not harmless beyond a reasonable doubt and reversed the judgment.

We granted the People's petition for review.

## DISCUSSION

■ Concerned that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures" that might lead an accused person to make statements in derogation of his or her Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise the accused of certain rights and to honor the accused's exercise of those rights. (*Miranda, supra*, 384 U.S. at p. 467.) Specifically, the accused must be warned "prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." (*Id.* at p. 479.) As the Supreme Court recently made clear in *Dickerson v. United States* (2000) 530 U.S. 428 [147 L.Ed.2d 405, 120 S.Ct. 2326], *Miranda* is a rule of constitutional magnitude. (*Id.* at pp. 437–441.)

■ Police advisement of a suspect's *Miranda* rights is the first line of defense against the suspect's involuntary waiver of the privilege against self-incrimination. (*Davis, supra*, 512 U.S. at p. 461.) In *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880], the court added "a second layer of prophylaxis for the *Miranda* right to counsel" (*McNeil v. Wisconsin* (1991) 501 U.S 171, 176 [115 L.Ed.2d 158, 111 S.Ct. 2204]), when it held that, once a suspect has asserted his or her right to counsel during custodial interrogation, the interrogation must cease and the suspect "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards, supra*, 451 U.S. at pp. 484–485.)

■ *Edwards*'s holding, by its own terms, applies only where "the accused in custody . . . has clearly asserted his right to counsel." (*Edwards v. Arizona*,

---

[2] The Court of Appeal also concluded that defendant's initial waiver of his rights was valid and rejected his claim that his statement was involuntary.

*supra*, 451 U.S. at p. 485.) In *McNeil v. Wisconsin, supra*, 501 U.S. 171, the high court emphasized the distinction between a request for counsel for purposes of custodial interrogation, implicating the Fifth Amendment privilege against self-incrimination, and a request for counsel for purposes of the Sixth Amendment right to counsel. "The purpose of the Sixth Amendment counsel guarantee—and hence the purpose of invoking it—is to 'protec[t] the unaided layman at critical confrontations' with his 'expert adversary,' the government, *after* 'the adverse positions of government and defendant have solidified' with respect to a particular alleged crime. [*United States* v.] *Gouveia* [(1984)] 467 U.S. [180, 189] [81 L.Ed.2d 146, 104 S.Ct. 2292, 2298.] The purpose of the *Miranda-Edwards* guarantee, on the other hand—and hence the purpose of invoking it—is to protect a quite different interest: the suspect's 'desire to deal with the police only through counsel,' *Edwards, supra*, [451 U.S.] at [p.] 484, [101 S.Ct. at p. 1884]." (*McNeil v. Wisconsin, supra*, 501 U.S. at pp. 177–178.) Therefore, invoking the Fifth Amendment interest "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." (*McNeil v. Wisconsin, supra*, 501 U.S. at p. 178.)

In *Davis, supra*, 512 U.S. 452, the court articulated the standard by which courts are to determine when a suspect's reference to an attorney, after an initial waiver of rights, constitutes a request for counsel. In *Davis*, defendant, who was being interrogated by Naval Investigative Service agents, was advised of, and waived, his *Miranda* rights but then, an hour and a half into the interview, said, " 'Maybe I should talk to a lawyer.' " (*Id.* at p. 455.) The agents reminded defendant of his right to counsel and told him they would not interrogate him further until he clarified whether he was requesting counsel. He told them he did not want an attorney and, after again being reminded of his right to remain silent and to counsel, the interrogation proceeded until he said, " 'I think I want a lawyer before I say anything else.' " (*Ibid.*)

In granting certiorari, the high court observed that there was no clear standard by which to evaluate an ambiguous or equivocal request for counsel. It noted that case law had evolved three approaches. Some courts had held that any mention of counsel, however ambiguous, was sufficient to require an immediate end to questioning. Others had sought to create a threshold of clarity so that comments falling short of that threshold would not constitute invocation of the right to counsel. Finally, some courts had permitted interrogators confronted with an ambiguous request for counsel to ask only clarifying questions about whether the suspect was requesting counsel. (*Davis, supra*, 512 U.S. at p. 456.)

 In articulating a governing standard, the high court held, preliminarily, that whether a suspect has invoked his or her right to counsel "is an objective inquiry." (*Davis, supra,* 512 U.S. at p. 459.) The court continued: "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that *a reasonable officer in light of the circumstances* would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (*Ibid.,* first italics added.) Accordingly, "the suspect must unambiguously request counsel. . . . Although a suspect need not 'speak with the discrimination of an Oxford don,' *post,* at 476 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." (*Ibid.*) A contrary result, the court observed, would transform *Miranda*'s protection into " 'wholly irrational obstacles to legitimate police investigative activity,' [citation], because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present." (*Id.* at p. 460, quoting *Michigan v. Mosley* (1975) 423 U.S. 96, 102 [46 L.Ed.2d 313, 96 S.Ct. 321].)

 The court acknowledged "that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present." (*Davis, supra,* 512 U.S. at p. 460.) However, the court stated, the *Miranda* warnings themselves, once explained to the suspect, who then knowingly and voluntarily waives them, are sufficient to dispel whatever coercion inheres in the interrogation process. *Edwards* provided "an additional protection" but "is one that must be affirmatively invoked by the suspect." (*Davis, supra,* 512 U.S. at p. 461.)

 The court characterized as "a bright line" the requirement in *Edwards* that questioning must cease upon a request for counsel and posited that this bright-light rule would be dimmed if police were forced to guess whether a defendant's ambiguous request for counsel required cessation of questioning "with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." (*Davis, supra,* 512 U.S. at p. 461.)

 Addressing whether police are required to ask clarifying questions of a suspect who makes an equivocal or ambiguous request for counsel, the court, while characterizing such questioning as "good police practice," "decline[d] to adopt a rule requiring officers to ask clarifying questions. If the

suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." (*Davis, supra,* 512 U.S. at pp. 461–462.)

■ Prior to *Davis,* decisions of this court and the Court of Appeal had "indicated that a request for counsel need not be unequivocal in order to preclude questioning by the police." (*People v. Crittenden* (1994) 9 Cal.4th 83, 129 [36 Cal.Rptr.2d 474, 885 P.2d 887].) However, because adoption of article I, section 28, subdivision (d) of the California Constitution requires California's appellate courts to apply federal standards to *Miranda* issues, *Davis* now provides the standard by which we assess whether a defendant's reference to counsel constituted an unambiguous and unequivocal invocation of the right to counsel. (*People v. Crittenden, supra,* 9 Cal.4th at pp. 129–130; see also *People v. Michaels* (2002) 28 Cal.4th 486, 510 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *People v. Cunningham* (2001) 25 Cal.4th 926, 992–993 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Box* (2000) 23 Cal.4th 1153, 1194–1195 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

■ Consistent with *Davis,* a reviewing court—like the trial court in the first instance—must ask whether, in light of the circumstances, a reasonable officer would have understood a defendant's reference to an attorney to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel, and with no further requirement imposed upon the officers to ask clarifying questions of the defendant. (*Davis, supra,* 512 U.S. at pp. 460–462.) In reviewing the issue, moreover, the reviewing court must "accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. [The reviewing court] independently determine[s] from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." (*People v. Cunningham, supra,* 25 Cal.4th at p. 992.)

Defendant challenged the admission of his statements to police on three distinct grounds. First, he argued he did not validly waive his rights; second, that, if he did validly waive his rights, his subsequent reference to a lawyer constituted a later invocation of *Miranda* counsel under *Edwards*; and, third, that his statements were coerced and therefore involuntary. The trial court rejected all three arguments. The Court of Appeal also rejected his first and third claims, but agreed with defendant that his reference to counsel, after having validly waived his rights in the first instance, invoked his *Miranda* right to counsel and that questioning should have stopped. The Court of Appeal concluded that defendant's initial comment to the officers about wanting a public defender, if charged, constituted "a sufficiently clear articulation of a desire to speak to counsel at that time" and should have been

understood as such by the police. The Court of Appeal found further that "there was no basis for concluding that appellant was sophisticated enough to draw the same distinction between booking and charging that a police officer or attorney would draw. At minimum, the detectives should have asked appellant whether he meant he wanted to consult an attorney if the police were going to keep him in custody." Finally, as evidence that police understood defendant had requested an attorney, the Court of Appeal referred to Detective Aldahl's "reaction" after defendant stated, during the third interview, he did not have a public defender, "You didn't get one?"

 We disagree with the Court of Appeal's analysis. On its face, defendant's statement was conditional; he wanted a lawyer *if* he was going to be *charged*. The conditional nature of the statement rendered it, at best, ambiguous and equivocal because a reasonable police officer in these circumstances would not necessarily have known whether the condition would be fulfilled since, as these officers explained, the decision to charge is not made by police. Confronted with this statement, a reasonable officer would have understood only that "the suspect *might* be invoking the right to counsel," which is insufficient under *Davis* to require cessation of questioning. (*Davis*, *supra*, 512 U.S. at p. 459.) Here, moreover, the detectives responded to defendant's statement by explaining to him the difference between being arrested and booked and being charged, thus providing him with an opportunity to clarify his meaning, but at no point in this initial exchange did defendant *unequivocally* request the *immediate* presence of an attorney before he would answer any more questions. It is this type of statement *Davis* requires before the police must terminate the interrogation. (*Id.* at pp. 461–462 ["If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him"].) Defendant's statement did not meet this standard of clarity.

Moreover, the Court of Appeal's concern about whether defendant was sophisticated enough to have understood the difference between being booked and being charged seems to focus on his ability to clearly articulate his desire for counsel, a consideration *Davis* rejects.[3] (*Davis*, *supra*, 512 U.S. at p. 460.) The question is not what defendant understood himself to be saying, but what a reasonable officer in the circumstances would have understood defendant to be saying. In this connection, the detectives were not required, under *Davis*, to ascertain whether, when he used the word "charged," defendant actually meant "arrested" or "booked," though, in effect, they gave him the opportunity to clarify this point when they explained to him the difference between

---

[3] Defendant's brief in this court devotes itself to establishing that "charged" means "booked" and the detective should reasonably have understood that when he said charged, defendant meant booked. Defendant establishes only that his statement was ambiguous. Under *Davis* such ambiguity is insufficient to invoke *Miranda* counsel.

those terms. Moreover, to the extent that defendant's prior contacts with law enforcement constituted a circumstance relevant to the reasonable officer's understanding of his statement, the record establishes that Detectives Henry and Aldahl were aware that defendant had been advised of his *Miranda* rights on previous occasions; defendant told them he was on probation and Detective Henry prefaced the *Miranda* advisement by asking defendant whether he had had his rights read "before," to which defendant replied, "Yes, I did." Therefore, the police could reasonably have assumed that defendant was capable of making an unequivocal request for counsel if he so desired.

The Court of Appeal also cited Detective Aldahl's response to defendant's subsequent reference to a public defender—"You didn't get one?"—as evidence that Aldahl understood defendant's initial reference to be a request for counsel. We disagree. Preliminarily, the Court of Appeal's characterization of Aldahl's remark as a "reaction" ignores Aldahl's testimony that the transcript shows a question where he simply made a statement. In and of itself, the statement is neutral. In any event, even if defendant's comment could be interpreted to mean that he thought he had requested counsel the previous day, again, *Davis* holds that the relevant inquiry is not what defendant thought he was saying, nor the ability of a defendant to clearly frame a request for counsel, but what a reasonable officer in light of the circumstances would have understood the statement to mean. If "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," questioning need not cease. (*Davis, supra,* 512 U.S. at p. 459.) In the circumstances of this case, we conclude that a reasonable officer could have understood that defendant's reference to a public defender if he was charged was not an unequivocal request for counsel at that moment.

The Court of Appeal also suggested that the detectives should have asked defendant clarifying questions about his reference to counsel. *Davis* specifically rejects a rule that requires police to seek clarification of a suspect's ambiguous or equivocal request for counsel. (*Davis, supra,* 512 U.S. at pp. 461–462.) Moreover, in this case, by explaining to defendant the distinction between an arrest and booking and being charged, the detectives did provide him with an opportunity to clarify the meaning of his statement. He failed to do so.

For these reasons, we conclude that the Court of Appeal erred and its reversal of defendant's conviction must itself be reversed.

## DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied March 16, 2005. Brown, J., did not participate therein.