[No. A118000. First Dist., Div. One. Dec. 17, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
JADE ANDERSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B.–II.D.

324

**Counsel**

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Karen Z. Bovarnick, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MARGULIES, J.**—Defendant was convicted of first degree murder a second time after a retrial, largely on the basis of her statements to police. We had reversed her initial conviction on grounds of instructional error.

On this second appeal, defendant contends that the court erroneously denied a renewed motion to suppress her statements to police. The initial trial court had denied a similar motion, rejecting defendant's claim that the police had violated her constitutional rights to silence and assistance of counsel. Although we affirmed that ruling on appeal, we reversed the conviction on other grounds. As a result of the reversal, defendant was entitled to raise her constitutional claims again upon retrial. In considering the renewed motion to suppress, the court refused to rehear the evidence considered by the initial trial court. After hearing new evidence bearing on the constitutional claims, it denied the renewed motion. Defendant now contends that the trial court was required to hold a de novo hearing at which all of the evidence bearing on the suppression of her statements could be presented. We find no error in the trial court's failure to hold the de novo hearing, concluding in the published portion of this opinion that because defendant's new evidence did not raise material factual or legal issues not considered by the original trial judge or create the realistic possibility that the factual findings of that judge were in error, she was not entitled to a de novo hearing.

Defendant also contends that our ruling in the first appeal on the suppression motion was erroneous, that during the second trial the court improperly admitted hearsay evidence and committed instructional error, and that the prosecutor committed misconduct. We affirm.

## I. BACKGROUND

This is defendant's second appeal. In a partially published decision, we reversed her earlier murder conviction because the trial judge failed to instruct on lesser included homicide offenses. (*People v. Anderson* (2006) 141 Cal.App.4th 430, 450 [45 Cal.Rptr.3d 910] (*Anderson I*).)

The evidentiary basis for defendant's prosecution was described in detail in *Anderson I*. In general, defendant told police that she and her boyfriend went to the victim's room in a motel to use drugs with him. After a time, her boyfriend and the victim began to fight. While the boyfriend was holding the victim in a headlock, defendant cut open the victim's pocket and stole his money. The pair then fled, leaving the victim to suffocate from a crushed larynx. (*Anderson I, supra*, 141 Cal.App.4th at pp. 435–438.)

In the nonpublished portion of *Anderson I, People v. Anderson* (July 18, 2006, A108482) (hereafter *Anderson I nonpub.*), we affirmed trial court rulings that defendant had not invoked her Fifth Amendment rights to silence and counsel during the extended interrogation that preceded her confession. Because this appeal largely concerns those Fifth Amendment contentions, the fact background is quoted from our prior opinion:

**Defendant's Statement Regarding an Attorney**: "This statement occurred four to five hours into the interview, at the end of the first of three videotapes. Approximately 15 minutes before making the statement, and before she was placed under arrest, defendant had been under sustained questioning from Detective Ronald Clark. Rather than responding to Clark's questions, she finally said, 'Can you take me home? Can you pick me up tomorrow? I don't feel well.'[1] The detective responded, 'Okay. Hold on,' and left the room. Defendant sat alone in the interview room for the next nine minutes. Finally, Clark and the other detective involved in the questioning, Gregory Lemmon, returned and placed her under arrest. After a brief discussion, the detectives left her alone for two more minutes. Then Clark returned and began to take defendant to the restroom, but, after prompting from an officer outside the room, he first removed her purse to search it, appearing to leave her alone in the room.

"At this point on the videotape, an officer outside the interview room, Detective Katherine Pickard, is faintly audible. Defendant says, 'I need a tampon.' Addressing defendant from off-camera, Clark notes that her purse contains only sanitary pads and asks, 'Is that what you want?' His hand is seen briefly at the edge of the video screen, holding something. After this, defendant sits quietly for seven seconds, alone on the videotape, and then says in an even voice, 'I need a lawyer.' There is no response from the police. Based on the sound of faint voices off camera, it appears that the officers were talking to each other outside the room at the time defendant's statement was made. Then there is a bit of laughter. Defendant continues looking toward the door. Twenty seconds after defendant spoke, Pickard, off-camera says, 'Is that okay?' Defendant responds, 'I don't care. Any one,' then stands and leaves the room. Throughout the remaining two videotapes, approximately another six or seven hours, defendant made no further reference to a lawyer, including after receiving the *Miranda*[2] warning regarding her right to one.

"Defendant moved to suppress her statement to the police. At the suppression hearing, Lemmon testified that no one was in the room when defendant

---

[1] "The following description is taken from the videotape. The audiotape of this portion of the interview was not provided to this court, but the transcript of the audiotape is generally consistent with the voices audible on the videotape."

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

said, 'I need a lawyer,' and that he was not aware she had made the statement. He testified, however, that Clark and Pickard were standing outside the open door at the time. Clark testified that when defendant made the statement he was searching her purse at Pickard's desk, located 'about five to ten feet' from the door of the interview room. He, too, testified that he did not hear her. Another officer, Detective Joseph Molettieri, had been posted in another room to monitor the interview by closed circuit camera, oversee the recording equipment, and take notes. Molettieri testified that his notes reflect that the interviewing detectives left the room for three minutes. During that interval, he heard defendant say, 'I need a lawyer.' His notes expressly state that no one was in the room when the comment was made. Soon after, Molettieri related defendant's comment to Clark, who had no reaction.

"The trial court refused to suppress defendant's statement to the police, ruling: 'With respect to "I need a lawyer" . . . , this is in a covert setting. [Defendant] did not know she was being taped. Both Sergeant Lemmon and Detective Clark's testimony was . . . that they were outside the interview room. Also if you look at [defendant] during this part of the tape it's like she's daydreaming or pondering even the manner in which she says "I need a lawyer" is more of a question that a statement. "I need a lawyer." It's not positive. Once again, it's as though as she's thinking out loud and pondering. So we get to the query that [the prosecutor] raised, is there a noise when a tree falls in the forest. Here, was this truly an invocation that she wanted, ["]I need a lawyer, I want a lawyer["?] I'm going to find it's not. . . . It's interesting that this third detective . . . was there monitoring it and did testify that he turned the information over to Detective Clark. Obviously Detective Clark did not remember it and/or did not converse with [defendant] on it. He had indicated that he felt if he had that word that he would have addressed that in the tape. [¶] However, I'm going to find . . . that it was not a clear invocation of her rights to sort of ponder and make this statement. I'm basing that on my viewing of the tape.' " (*Anderson I nonpub., supra,* A108482.)

**Defendant's Purported Statement Regarding Her Right to Silence**: "Sometime after the detectives and defendant returned from the bathroom break described in the previous section, the detectives informed defendant of her rights under *Miranda*. After substantial further discussion, during which defendant continued to maintain her ignorance of the victim, the interview turned briefly to defendant's family. The police transcriptionists relate the conversation in the following manner, where 'Q' and 'Q1' are the words of the two detectives and 'A' is defendant:[3]

---

[3] "As discussed in more detail in footnote [1], *ante,* we conclude that this transcript was prepared entirely from the audiotapes of the interview."

" 'Q1. If you truly had nothing to do with this, okay? And you are a witness to this thing, and you are truly a witness to this incident, if you're scared out of your mind . . . I mean this has gone on for so many years in the drug world where people are afraid to give people up. Okay? Um, for any number of reasons, you know there's all kind of [. . .] .

" 'A. Oh, my god. You guys don't fuckin' know.

" 'Q1. Do you?

" 'A. I got a family out there. My family would be killed. Man,

" 'Q. You, you tell the truth, you can be protected.

" 'Q1. You can be, are they going to be any more happy with you being in jail for something you didn't do? That's screwed up too.

" 'A. I'm not happy about that. I'm not happy about none of it.

" 'Q1. Well, do the right thing.

" 'A. *I just want to go home. Phone and tell her. I don't want to be here and talk to you guys. Please don't talk to me.*

" 'Q1. I will give you a phone after you do that. I will.

" 'A. You lied to me earlier. You promise me?

" 'Q1. I promise you that I will give you a phone and let you call them and tell them to come down here. In fact, I would encourage you to do that. I will definitely.

" 'A. But would (unintelligible) get caught?

" 'Q1. Yeah, we definitely want to talk to them.

" 'Q. No. I want to know what happened.'

"(Italics added.)

"Defendant also sought to suppress her statement to the police on the basis of the transcribed statement, 'I just want to go home. Phone and tell her. I don't want to be here and talk to you guys. Please don't talk to me.' At the

suppression hearing, Lemmon testified that, notwithstanding the words recorded in the transcript, defendant never said she wanted to terminate the interview. Shown the videotape and the transcript, the detective said, 'I couldn't tell what she says at that point.' Clark similarly testified that defendant never asked to stop the interview. Shown the videotape, the detective testified he did not believe defendant said, 'Please don't talk to me.' Instead, his recollection was that '[i]t was during a conversation during which she was concerned for her family and her safety and her being a snitch and someone having retaliation against her family and she wanted to talk to her family.'

"The trial judge denied the motion to suppress on this ground, holding that, in effect, the transcriptionists got it wrong: 'Was there an invocation when she made the statement that's attributed to her in the transcript "Please don't talk to me["?] . . . Yesterday afternoon I must have played that 15 or 20 times in chambers. I played it at full volume and the way I got the complete answer was "Just want to go home. Use your phone and tell them, tell them, hum, I'm here and talk to you guys. Please don't," and then I'm not sure if I really hear the word ["]talk["] or some other word or expletive and then I really could not make out what was said. [¶] Based on that ambiguity, I find that that was not an invocation and that it appears to me the transcript . . . has inaccuracies [in the] transcription of that part of the tape.' " (*Anderson I nonpub., supra,* A108482.)

Following our reversal and remand in *Anderson I,* defendant renewed her motion to suppress evidence from the interrogation, claiming that her statement, "I need a lawyer," constituted an invocation of the right to counsel and that the police transcript accurately reflected her request to stop the interrogation, thereby invoking her right to silence. At the hearing on the motion, defense counsel requested that the trial court "conduct its own de novo look at this whole statement issue and make an informed decision with all of the evidence." He noted that defendant was prepared to offer as additional witnesses an expert who had prepared an "enhanced" copy of the videotape and the third officer involved in the right to counsel claim, Katherine Pickard. The trial court declined the request to conduct a de novo hearing, concluding that it was necessary to hear only the witnesses and evidence not considered by the trial judge who ruled on the original suppression motion. Although the court does not appear to have reviewed the transcripts of testimony from the first trial, it was familiar with our summary of that evidence in *Anderson I nonpub., supra,* A108482.

Thereafter, the trial court heard the testimony of Pickard and viewed the videotape of the portion of the interrogation in which defendant said she needed a lawyer. The court then heard the testimony of Paul Blake, a sound

technician. In order to increase the clarity of the voices on the portion of the audio track of the interrogation videotape during which defendant claims to have stated that she wanted to end the interrogation, Blake had electronically manipulated the sounds on the tape. His work was reflected in an "enhanced" CD (compact disc) that was played for the court.[4]

Following Blake's testimony, the court listened to the enhanced CD several more times, finally concluding, "I can hear, 'Please don't talk.' I'm not sure what comes after that. [¶] . . . [¶] As a matter of fact, the Court of Appeal at page 18 [of *Anderson I nonpub., supra*, A108482] says as follows: Quote, 'Our review found that the only words audible with certainty are . . .' quote—the relevant portions—'. . . home . . . phone and tell . . . here and talk to you guys. Please don't talk . . .' unquote. [¶] So I think they got about as far as we did. And if that's the status of it, these other words simply cannot be clearly understood. [¶] It's not—it's not real clear. I mean, I could—I think on this record the critical words, quote, 'Please don't talk to me,' unquote, are not clearly audible on the tape I've just listened to."

Following extensive additional argument, the court denied the motion to suppress, ruling, "[W]hat we've tried to do is hear what, if any, additional evidence there might be, additional meaning in addition to what was heard by the judge in the prior trial in connection with the Miranda motion. [¶] We've heard from Officer Pickard and now we've heard from Mr. Blake and listened to the enhanced tape . . . . [¶] . . . [¶] . . . [H]aving done all that, I think we have really done as much as we can in terms of any additional evidence and it's my conclusion the evidence is essentially the same. If anything, it seems to me Officer Pickard just would confirm what took place. [¶] And also I don't think that having heard from Mr. Blake and listening to that tape changes anything. [¶] And so accordingly, I am going to deny the defendant's motion. I'll find that the defendant's statement was voluntary in the Constitutional sense."

## II. DISCUSSION

Defendant contends that the trial court erred in denying her renewed motion to suppress her statements to the police, improperly admitted hearsay statements, and gave conflicting and inaccurate jury instructions. She also contends that the prosecutor committed misconduct by arguing facts that were not supported by the record.

---

[4] The court reporter did not transcribe the contents of the enhanced CD, and the parties did not include a copy of the CD in the appellate record.

## A. The Motion to Suppress

### 1. The Failure to Provide a De Novo Hearing

■ With respect to both aspects of her motion to suppress, the claimed invocations of her right to counsel and her right to silence, defendant contends that the trial court erred in hearing only the additional evidence that she offered, without conducting a de novo hearing at which the testimony heard previously was repeated. As discussed below, we conclude that the trial court did not err in failing to conduct a de novo hearing. The general rule is that, following the reversal of a conviction, a defendant is entitled to have issues determined anew. When the appellate court has actually ruled on a particular issue, however, the law of the case doctrine may preclude such redetermination. Because the evidence offered by defendant on remand was substantially the same as the evidence we considered in affirming admission of defendant's statements in *Anderson I nonpub., supra*, A108482, the trial court was bound by the doctrine to adhere to that ruling.

The leading case is *People v. Mattson* (1990) 50 Cal.3d 826 [268 Cal.Rptr. 802, 789 P.2d 983] (*Mattson*) (superseded by statute on another ground as stated in *People v. Bolin* (1998) 18 Cal.4th 297, 315, fn. 2 [75 Cal.Rptr.2d 412, 956 P.2d 374]), which the Supreme Court heard on appeal from a retrial. In reviewing the first trial, the court had found that, on the record presented, the defendant's confessions should have been ruled inadmissible, and it reversed the defendant's conviction on that basis. (*Mattson*, at pp. 838, 848.) On remand, the trial court permitted the prosecution to relitigate the admissibility of the defendant's confession. In doing so, the prosecutor introduced additional evidence regarding the circumstances of the interrogation that caused the trial court to rule the confession admissible. (*Id.* at p. 849.) In *Mattson*, the defendant contended that the prosecution should not have been permitted to relitigate the admissibility of his confession under the law of the case doctrine, since the matter already had been determined by the Supreme Court in the first appeal. (*Ibid.*)

■ The court rejected that contention, citing the general rule that evidentiary issues may be relitigated after a matter has been reversed and remanded for a new trial: "A reversal of a judgment without directions is an order for a new trial. [Citation.] 'An unqualified reversal remands the cause for new trial and places the parties in the trial court in the same position as if the cause had never been tried.' [Citation.] . . . [¶] That status even permits amendment of the accusatory pleading [citation], as well as renewal and reconsideration of pretrial motions and objections to the admission of evidence . . . , and the court must consider the admissibility of that evidence at the time it is offered. [Citations.] *In limine* rulings are not binding. [Citation.] [¶] Defendant's

claim that our determination that his confession should have been excluded at the first trial constitutes the 'law of the case' lacks merit. The law-of-the-case doctrine binds the trial court as to the law but controls the outcome only if the evidence on retrial or rehearing of an issue is substantially the same as that upon which the appellate ruling was based. [Citations.] The law-of-the-case doctrine applied to this court's prior ruling only insofar as we held that California law governed the admissibility of the confessions. The trial court did not depart from that ruling in its determination, based on new evidence, that the confessions were admissible." (*Mattson, supra,* 50 Cal.3d at pp. 849–850, fn. omitted.) As the court subsequently summarized its holding, "the law-of-the-case doctrine is inapplicable to the determination of questions of fact [citation] decided on the basis of new or different evidence in a new trial following reversal on appeal." (*Id.* at pp. 852–853.)[5]

■ While *Mattson* sets out the general rule that parties are permitted to relitigate suppression motions on remand following an unconditional reversal, it does not specify the manner in which that relitigation should occur. *Mattson* therefore contains no express requirement that parties must be provided a de novo evidentiary hearing in these circumstances.

Nonetheless, the court makes clear that an unconditional reversal ordinarily wipes the slate clean. (*Mattson, supra,* 50 Cal.3d at pp. 849–850.) This is consistent with a long line of authority holding that parties are entitled to have the trial court "redetermine" evidentiary and other matters after an unconditional reversal. (*People v. Murphy* (1963) 59 Cal.2d 818, 833 [31 Cal.Rptr. 306, 382 P.2d 346].) To the extent such a redetermination rests on findings of fact, the remand court must make those findings anew, without relying on the findings of fact made in connection with the prior trial. Similarly, on retrial the court must reevaluate matters committed to judicial discretion, without relying upon any exercise of judicial discretion in the prior trial. It stands to reason that when a de novo evidentiary hearing is necessary for the independent finding of facts or exercise of discretion—for example, when the findings depend upon the credibility of witness testimony—the remand court must conduct a de novo hearing.

■ Yet that conclusion does not resolve the question before us. As *Mattson* implicitly recognizes, with respect to any issues that were *actually addressed* by the appellate court, a tension exists between this general rule requiring redetermination on retrial and the law of the case doctrine. Because the law of the case doctrine requires legal rulings made on appeal to be

---

[5] In a subsequent decision, the court rejected the contention that the introduction of new evidence upon retrial should be limited to evidence that could not, in the exercise of due diligence, have been presented at the time of the first trial. (*People v. Barragan* (2004) 32 Cal.4th 236, 252 [9 Cal.Rptr.3d 76, 83 P.3d 480].)

respected upon retrial, the doctrine actually *prohibits* the trial court from reconsidering any legal ruling made by the appellate court.

The application of this principle to the typical suppression motion ruling is not straightforward, since suppression motions often require the trial court to make both factual and legal rulings. The appellate court reviews the trial court's findings of fact under a deferential standard, but the application of constitutional requirements to those findings of fact is reviewed de novo, as a matter of law. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 642 [21 Cal.Rptr.3d 612, 101 P.3d 509].) Accordingly, the law of the case doctrine must be applied to an appellate holding that may, and often does, depend upon both factual and legal rulings.

■ The court in *Mattson* resolved any uncertainty in the application of the doctrine in these circumstances by holding that an appellate court's ruling on a suppression motion must be adhered to on remand unless the evidence presented is not "substantially the same" as the evidence presented at the first trial. (*Mattson, supra,* 50 Cal.3d at p. 850.) Stated differently, a party is entitled to have a suppression motion redetermined on remand only if the party offers "new or different" evidence from the evidence considered by the original trial court. (*Id.* at p. 853.) Given this direction, a trial court presented on remand with a renewed suppression motion following an appellate court ruling on the suppression issues must, first of all, determine whether the renewed motion involves "new or different" evidence. If not, the trial court must follow the ruling of the appellate court; if so, the trial court must redetermine the suppression motion.

■ *Mattson* did not attempt to define "new or different" evidence for these purposes. The phrase cannot be read literally to mean that the mere presentation of some new item of evidence, regardless of its significance, automatically relieves the trial court of the obligation to follow the prior appellate ruling, since such a reading would render the law of the case doctrine toothless. Rather, in order to trigger a redetermination, the evidence offered on remand must be sufficient, at least potentially, to result in a different outcome on the suppression motion; in the absence of such evidence, the law of the case doctrine would require adherence to the appellate ruling. (See *People v. Sackett* (1968) 260 Cal.App.2d 307, 308, 310 [67 Cal.Rptr. 157] [applying law of the case doctrine where evidence presented on remand was "much more detailed" but not different in content].) Accordingly, in order to qualify as "new or different" evidence under *Mattson*, the evidence presented on remand must *raise material factual or legal issues not considered by the original trial judge or create the realistic possibility that the factual findings of that judge were in error.* Unless the party seeking redetermination has presented new or different evidence as so defined, the

evidence before the remand court will be "substantially the same" as that facing the original trial court, and the remand court must adhere to the appellate ruling. (*Mattson, supra*, 50 Cal.3d at pp. 850, 853.) On the other hand, if such new or different evidence has been presented, the trial court must redetermine the motion by rendering a ruling independent of the original trial court ruling.

In this matter, the trial court concluded, after hearing only defendant's additional evidence regarding her two purported invocations, that the new evidence was "essentially the same" as the evidence presented the first time. The court therefore adhered to our rulings in *Anderson I nonpub., supra*, A108482, and denied the motion to suppress.

We find no error in the trial court's conclusion that the evidence presented in connection with defendant's purported invocation of her right to silence was not new or different.[6] As noted above, the issue turned entirely on defendant's comments during a brief period of her interrogation. The police transcriptionist had recorded defendant as saying during this period, "I just want to go home. Phone and tell her. I don't want to be here and talk to you guys. Please don't talk to me," which defendant argued was an invocation of her right to silence. (*Anderson I nonpub., supra*, A108482.) The officers present at the interrogation testified that they did not recall defendant asking them to stop the interrogation, and the first trial judge found that this portion of the tape was garbled. Unlike the police transcriptionist, he could not make out defendant's words. He therefore denied the motion to suppress. In *Anderson I nonpub.*, we affirmed this conclusion as supported by substantial evidence, noting, "Our review [of the critical portion of the audio recording] found that the only words audible with certainty are '. . . home . . . phone and tell . . . here and talk to you guys. Please don't talk . . . ,' with the ellipses indicating words that cannot be clearly understood." We also noted that the general context of the conversation and the reactions of the parties did not support a conclusion that defendant had attempted to end the interrogation. (*Anderson I nonpub., supra*, A108482.)

On remand, the only additional evidence presented by defendant bearing on this issue was a CD containing the critical portion of the tape electronically enhanced in an effort to increase the clarity of defendant's words. If the enhanced audio revealed that the police transcriptionist's version was correct, the enhanced CD would constitute just the type of new or different evidence that would justify the trial court in disregarding our ruling in *Anderson I*

---

[6] We apply de novo review to the trial court's conclusion that the additional evidence was not actually new or different, and therefore did not require redetermination, because of its close association with the enforcement of Fifth Amendment rights. (E.g., *People v. San Nicolas, supra*, 34 Cal.4th at p. 642.)

*nonpub., supra*, A108482. The trial court, however, concluded that defendant's words on the enhanced CD were not clear, noting, "I can hear, 'Please don't talk.' I'm not sure what comes after that," and that the clarity of the enhanced CD was no greater than the clarity of the original tape as perceived by this court in *Anderson I nonpub., supra*, A108482.[7] Because the enhanced CD was no more clear than the tape available to the first trial judge, and therefore provided no new information, it did not qualify as the type of new or different evidence that would require the trial court to redetermine this suppression issue. The trial court was therefore required to, and properly did, adhere to our ruling in that decision.

Further, we find no abuse of discretion in the trial court's refusal to provide a de novo hearing in determining whether the additional evidence was new or different.[8] In both the first and second trials, the primary evidence bearing on this issue was the tape of defendant's words. The trial court had available to it that tape and this court's conclusions with respect to the tape's clarity. The additional evidence, the enhanced CD, was simply a reiteration of this evidence. Because the court could resolve the issue before it by comparing the CD with the original tape, it was unnecessary for the trial court to conduct a more extensive de novo hearing in order to determine that the enhanced CD was not new or different evidence.

We reach similar conclusions with respect to defendant's contention that she invoked her right to counsel. On remand, defendant presented testimony by the third officer present at the critical time, Detective Pickard. Although this officer did not testify at the first hearing, that fact alone does not make her testimony new or different evidence sufficient to require redetermination. Rather, to qualify as such evidence her testimony must have raised factual or legal issues not considered by the original trial judge or create the realistic possibility that the factual findings of that judge were in error.

As discussed above, Detective Clark testified at the first hearing that he was located outside the interview room, five to 10 feet from the door, and was searching defendant's purse when she said she needed an attorney. He did not hear her make the statement. The first trial judge found this testimony credible, noting that the issue was whether "there [is] a noise when a tree

---

[7] Defendant does not challenge the accuracy of these conclusions about the clarity of the CD, and we would, in any event, be unable to review them because the enhanced CD was not made a part of the appellate record.

[8] The decision not to hold a de novo hearing for the purpose of determining whether the additional evidence qualified as "new or different" evidence is the type of decision committed to the discretion of the trial court, and we review it for abuse of discretion. (E.g., *People v. Avila* (2006) 38 Cal.4th 491, 604 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *In re Henry S.* (2006) 140 Cal.App.4th 248, 259 [44 Cal.Rptr.3d 418]; *People v. Garcia* (2005) 134 Cal.App.4th 521, 539–540 [36 Cal.Rptr.3d 181].)

falls in the forest" and concluding "it was not a clear invocation of her rights to sort of ponder and make this statement." (*Anderson I nonpub., supra,* A108482.) In affirming this decision, we noted that the relevant question was " 'whether, in light of the circumstances, a reasonable officer would have understood a defendant's reference to an attorney to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel.' " (*Anderson I nonpub., supra,* A108482, quoting *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125 [23 Cal.Rptr.3d 295, 104 P.3d 98].) We held that this test necessarily requires that an officer hear the invocation and found substantial evidence "to support the trial court's implicit factual finding that none of the officers known to defendant heard her statement." (*Anderson I nonpub., supra,* A108482.)

On remand, Pickard testified that she had been asked to assist the interrogating officers, particularly with tasks requiring the participation of a woman. At the moment in question, Pickard had been asked to escort defendant to the bathroom. As she approached the interview room, Clark walked out with defendant, carrying her purse. When Clark handed Pickard the purse, Pickard asked whether he had searched it. When Clark said he had not, Pickard looked in the purse, while Clark returned defendant to the interview room. Pickard searched the purse at her desk, which was located "five to six feet" from the door of the interview room and "15 to 20 feet" from where defendant was seated in the interview room, thereby placing defendant 10 to 15 feet inside the room. The door of the interview room was ajar about a foot, giving Pickard a line of sight to defendant's chair. Pickard could not see defendant, however, because Clark was standing between Pickard and the door, with his back to the door, intentionally blocking defendant's view of the purse. While the search was occurring, Clark walked "back and forth" from the interview room, "[i]ntermittently" speaking with defendant and Pickard. As Pickard testified, Clark would "[o]pen the door [to the interview room], lean in . . . and then come back out leaving the door slightly ajar. He'd lean back in, say what he had to say, close the door slightly leaving it ajar, come back to where I was." At no time did Pickard hear defendant say she needed a lawyer.

The trial court refused to reconsider the initial ruling on the basis of Pickard's testimony, concluding, "If anything, it seems to me Officer Pickard just would confirm what took place." While defendant recognizes that Pickard's testimony was generally consistent with that of the two interrogating officers, she argues that "Pickard's testimony differed from Clark's testimony on a few crucial points" that called into question the credibility of Clark's testimony. First, Pickard's testimony placed her desk closer to the door of the interview room than Clark's did. Pickard testified that the desk was five to six feet from the door, with the edge of the desk four feet from

the door, while Clark placed the desk five to 10 feet away. Second, Pickard testified that Clark was between her and the door during the search, rather than at the desk. Both items of testimony suggested that Clark was closer to the door of the room than five to 10 feet, which is the distance he estimated in his testimony at the first suppression hearing.[9] Assuming he was standing at the edge of the desk, Pickard's testimony placed Clark at three to four feet from the door of the interview room, rather than five to 10 feet, as he had testified. The difference, defendant argues, is sufficient to call into question Clark's testimony that he did not hear defendant say she needed a lawyer and the trial judge's factfinding to that effect.

We agree with the trial court that this difference was not so significant as to call into question the first trial court's conclusions about the credibility of Clark's testimony. In making that determination, it is necessary to place Clark's testimony that he did not hear defendant in its full context. Pickard's testimony makes clear that at the time defendant made her statement, Clark was standing near Pickard's desk, outside the interview room, with his back to the door of the interview room. That door was largely closed, left ajar only one foot. The purpose of closing the door was, presumably, to impede defendant from hearing the officers, but it also would have made defendant's voice less audible to them. As the videotape makes clear, defendant did not raise her voice to catch Clark's attention when she made her statement; she spoke in an even voice. Further, as we noted in *Anderson I nonpub., supra,* A108482, "[b]ased on the sound of faint voices off camera, it appears that the officers were talking to each other outside the room at the time defendant's statement was made."

Given this context, it is immaterial whether Clark was three to four feet from the door or five to 10 feet. At the time, he was standing with his back to defendant, at least 13 feet from where she was seated,[10] separated from her by a largely closed door, and was distracted by the purse search and the conversation surrounding it. Pickard, who was standing close to Clark, did not hear defendant's statement either. Under these circumstances, the fact that Clark might have been from one to six feet closer to the door than he testified does not provide reason to doubt his testimony that he did not hear her speak. While Pickard's testimony introduced new details, it was not sufficiently different from Clark's testimony to require the trial court to redetermine the suppression issue. Further, because the account of Clark's testimony provided in our prior decision was available to the trial court, we find no abuse of

---

[9] This is not necessarily conflicting testimony. Clark's statement that he was "at" the desk could refer to his standing at the edge of the desk, as Pickard said. What is significant is that Pickard's testimony placed Clark a few feet closer to the door of the interview room.

[10] Thirteen feet is the minimum distance from Pickard's testimony, based on her memory that defendant was at least 10 feet inside the interview room, and Clark was at her desk, the side of which was four feet from the interview room door.

discretion in the court's conclusion that it was unnecessary to conduct a de novo hearing to determine whether Pickard's testimony was new or different or to evaluate Clark's credibility.

    ■   In summary, we conclude that, under the law of the case doctrine, defendant was not entitled to have her suppression motion redetermined on remand unless she was able to present evidence that justified, at least potentially, a different ruling on the motion. Having reviewed the new evidence she provided in the trial court, we agree that it was not sufficiently different from the evidence presented previously to call into question the validity of our prior ruling. The trial court therefore correctly followed that ruling in finding defendant's statements admissible.

### 2. *Defendant's Other Suppression Arguments*

Defendant also contends that our legal rulings in connection with the suppression motion in *Anderson I nonpub., supra*, A108482, were in error because (1) stare decisis required us to follow *People v. Gaston* (1978) 20 Cal.3d 476 [143 Cal.Rptr. 205, 573 P.2d 423] (*Gaston*), and permit use of the settled statement in determining defendant's words on the tape; (2) our reasoning that defendant failed to make an unequivocal and unambiguous request for counsel represented a misapplication of relevant authority; and (3) defendant should have been found to have invoked her right to counsel because a police officer who was monitoring the interview, unknown to defendant, overheard her say she needed an attorney.

Because we conclude that our ruling in *Anderson I nonpub., supra*, A108482, on the suppression motions must be respected under the doctrine of law of the case, we need not discuss these purely legal arguments. Nonetheless, we have considered each of them and conclude that they provide no basis for reconsidering our rulings in *Anderson I* with respect to the use of the settled statement or the admissibility of defendant's statements to the police.[11]

---

[11] Defendant's claim that *Gaston* is binding under the doctrine of stare decisis fails because *Gaston* construed the phrase "oral proceedings" as used in California Rules of Court, former rule 33 (generally equivalent to current rule 8.320), while in *Anderson I*, we construed the same phrase as used in former rule 32.3 (now rule 8.346). (Cf. *Gaston, supra*, 20 Cal.3d at p. 485; *Anderson I, supra*, 141 Cal.App.4th at p. 440.) Because the same word or phrase can have a different meaning when used in different statutes, or even different portions of the same statute (e.g., *In re Hall* (1982) 132 Cal.App.3d 525, 530 [183 Cal.Rptr. 560]), a Supreme Court ruling on former rule 33 is not stare decisis as to the interpretation of former rule 32.3. Further, *Gaston* is generally supportive of our holding in *Anderson I*, in that *Gaston* precluded the

B.–D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION

The judgment of the trial court is affirmed.

Marchiano, P. J., and Swager, J., concurred.

A petition for a rehearing was denied January 9, 2009, and appellant's petition for review by the Supreme Court was denied March 25, 2009, S169808.

---

inclusion in the appellate record of a later-prepared transcript of a tape recording that was played at trial but not simultaneously transcribed as part of the official stenographic record.

Defendant contended at oral argument that we "largely overlooked" in *Anderson I* the monitoring officer's having overheard her statement regarding an attorney. On the contrary, we expressly rejected her current argument on that topic, holding that, "Because defendant did not make her statement in a manner likely to be heard by the officers of whom she was aware, the fact that the undisclosed monitoring officer heard the statement is of no constitutional significance. Defendant was required to assert her right unequivocally and unambiguously, not simply muse about it in a manner that might inadvertently be overheard." (*Anderson I nonpub., supra*, A108482.) Because defendant did not invoke her right to an attorney merely by being overheard, it is immaterial that the monitoring officer later told the interrogating officer what he had heard.

*See footnote, *ante*, page 321.