[No. G023005. Fourth Dist., Div. Three. Sept. 30, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
JAIME E. BELTRAN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

**COUNSEL**

Deanna F. Lamb, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, William M. Wood and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**SILLS, P. J.**—A jury convicted Jaime E. Beltran of attempted murder (Pen. Code, §§ 664, 187)[1] committed willfully, deliberately and with premeditation (§ 664, subd. (a)), and assault with a semiautomatic firearm (§ 245, subd. (b)). It also found he inflicted great bodily injury (§ 12022.7), and personally used a firearm (§ 12022.5, subd. (a)). The trial court sentenced Beltran to an indeterminate sentence of life in prison with the possibility of parole for the attempted murder, plus a 10-year enhancement for the use of the firearm. Beltran raises three arguments on appeal: (1) Statements he made to the police after invocation of his *Miranda*[2] rights were involuntary and should have been suppressed by the trial court; (2) his conviction for assault with a semiautomatic firearm must be reversed because the jury was inadequately instructed as to the intent element of that crime; and (3) there was insufficient evidence presented to support the verdict of attempted murder and the finding of premeditation. We affirm.

### I

### Facts

A group of friends was hanging out in front of Reynaldo Jimenez's apartment when a man who appeared to be intoxicated lifted up his shirt as he walked by, exposing a gun in his left front pants pocket. Some members of the group went to the man's nearby house and when he came outside, they tackled him and took the gun away from him. Beltran, the man's roommate, stood and watched. About an hour later, Beltran went to Jimenez's house and asked him to give the gun back. Jimenez told him he did not have the gun but said he would try to get it back.

Over the next few days, Beltran came to Jimenez's house several times, trying to get the gun back. Jimenez finally told Beltran to talk to his friend Richard, who had taken the gun after the incident. When Beltran asked him what was up with the gun, Richard said it was "astuvo," a Spanish word roughly translated as "it's gone, it's no more, forget about it." Beltran looked upset and mad as he walked away.

A couple of hours later, Ricardo Arreola crossed the street from his house and walked up to the back gate to Jimenez's yard. He whistled to get Jimenez's attention, and then heard footsteps behind him. Just as he turned, he was shot in the right side of his chest. He was shot again, in the right foot,

---

[1] All further statutory references are to the Penal Code.

[2] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

and heard the shooting continue as he ran in through the gate and into the house. He believes he heard approximately 10 shots fired altogether. The paramedics were summoned and Arreola was taken to the hospital. One bullet had entered the right side of his chest and traveled through to the left without hitting any major organs. It was removed from where it had lodged under the skin, his wounds were dressed, and he was released after two days of hospitalization.

The police recovered a bullet from the trunk of Jimenez's car, which was parked in front of his house, and found bullet holes near the trunk key hole and on the side of the roof of the car. They found a bullet hole in a wooden post in the backyard and three bullet holes in the gate. A bullet was found in a pile of manure in the backyard. A bullet fragment fell out of Arreola's shoe when the paramedics removed it to check his foot, and another bullet was removed from his chest.

A few days after the shooting, the police received a call regarding two men passing items across the fence between an apartment complex and a church parking lot. The police officer who responded contacted Beltran, one of the men. Beltran gave the officer a false name, and could not produce any identification. After admonishing him not to drive without a driver's license, the officer let Beltran go. But when Beltran got in his car and drove off, the officer followed him and initiated a traffic stop. After determining his true identity, the police arrested him and took him to juvenile hall.

The next day, a detective approached Beltran in juvenile hall, informed him of his *Miranda* rights and questioned him about the shooting after he agreed to speak. Beltran admitted the intoxicated man with the gun was his roommate, Elmer, but denied any knowledge of the shooting. He told the detective he had moved to his sister's house in Los Angeles the afternoon of the shooting. The detective took a Polaroid picture of Beltran and used it to put together a "six-pack" picture lineup. Jimenez identified Beltran as the man who had come back complaining about the gun, but said he could not positively identify him as the shooter. Arreola did not pick Beltran's photo at first but three days later, when he was shown the pictures again, he identified Beltran as the man who had shot him. In court, Arreola positively identified Beltran as the man who had shot him.

After the first interview regarding the shooting, Beltran's attorney, who was appointed to defend him on a separate charge, filed a document on his behalf purporting to invoke Beltran's Fifth and Sixth Amendment rights to

have counsel present and to remain silent during questioning.[3] Four days after the invocation was filed, the police again approached Beltran at juvenile hall for questioning. After they read him his *Miranda* rights, he agreed to speak to them.

In that interview, Beltran said when he had pulled in front of his house the night Jimenez and his friends took the gun away from Elmer, he saw the group struggling with Elmer. He said when he tried to go to Elmer's assistance, the group grabbed him and held him by the arms. He recognized Jimenez as the person who lived down the street and drove a brown car. After the group took the gun from Elmer, they left. Beltran later saw Victor, whom he recognized as one of the group. He asked him if he could get his gun back and Victor told him he didn't know, but he would relay the message. Beltran said he asked for the gun three or four more times until he was told it was in Riverside and he could not get it back. He said he moved to his sister's house in Los Angeles, but then got a friend of his to give him a ride back to Costa Mesa because he was angry that they would not give him his gun back. His friend loaned him a gun, a silver-colored .380 semiautomatic.

When he arrived in his old neighborhood, he saw the group standing in front of Jimenez's house. He parked the car south of the house and approached on foot. He said he walked up to Jimenez's brown car and shot at it seven times. After he shot at the car, he and his friend drove northbound toward Los Angeles. They pulled off the freeway in Anaheim and threw the gun in some bushes.

Beltran made a pretrial motion to suppress the statements he made in the interview conducted after his lawyer purportedly invoked his Fifth and Sixth Amendment rights. The prosecution conceded Beltran had "valid arguments when it comes to the defendant invoking his Sixth Amendment right and his Fifth Amendment right" with regard to the juvenile charges, but that "doesn't have anything to do with any future proceedings." He said it was "ridiculous" to think that an attorney could invoke his client's rights "for all

---

[3]That invocation, filed with the juvenile court and signed by Beltran's counsel, reads: "The above-named minor (personally and/or through counsel) hereby invokes his/her right to counsel, including the right to have counsel present, the right to remain silent, and the privilege against self-incrimination, as to this case and *any other matter* whether or not a complaint has been filed therein, as provided under the Fifth, Sixth, and Fourteenth Amendments of the United States. Constitution, and Article I, section 15, of the California Constitution. This invocation includes, but is not limited to, all of the rights available under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], and *Edwards v. Arizona* (1981) 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378], including, but not limited to, the Fifth Amendment right to counsel." (All italics in original.)

proceedings," citing *McNeil* v. *Wisconsin* (1991) 501 U.S. 171 [111 S.Ct. 2204, 115 L.Ed.2d 158]. He pointed out Beltran's public defender was appointed on the juvenile charges and was not his attorney "on this new case because the new case hadn't been to court yet." The trial court found "that all of the statements were voluntary including that on the 24th [subsequent to the invocation of rights] beyond a reasonable doubt" and denied the motion. Those statements were presented to the jury.

## DISCUSSION

## II

### *Suppression of Statements*

■ Beltran argues that his Fifth Amendment right to have an attorney present during questioning was properly invoked by the document his attorney filed on his behalf. We disagree. The proposition that appointed counsel in one case can file a blanket invocation preventing the police from questioning their client about any other case, even where the client voluntarily waives his rights to remain silent and to have his attorney present during questioning, has been foreclosed by the United States Supreme Court in *Moran* v. *Burbine* (1986) 475 U.S. 412 [106 S.Ct. 1135, 89 L.Ed.2d 410] and *McNeil* v. *Wisconsin, supra,* 501 U.S. 171.

In *Moran* the court held that the respondent validly waived his *Miranda* rights even though he was unaware counsel obtained on his behalf sought to speak with him but had been turned away by the police. (*Moran* v. *Burbine, supra,* 475 U.S. at p. 421 [106 S.Ct. at pp. 1140-1141].) "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." (*Id.* at p. 422 [106 S.Ct. at p. 1141].) In a footnote, the United States Supreme Court rejected "a novel 'agency' theory of the Fifth Amendment under which any perceived deception of a lawyer is automatically treated as deception of his or her client. This argument entirely disregards the elemental and established proposition that *the privilege against compulsory self-incrimination is, by hypothesis, a personal one that can only be invoked by the individual whose testimony is being compelled."* (*Id.* at p. 433, fn. 4 [106 S.Ct. at p. 1147], italics added.)

Both the holding and dicta in *Moran* preclude Beltran's attorney from unilaterally invoking his client's Fifth Amendment rights. The right is a personal one which must be invoked by the individual whose testimony is being compelled, and there is no agency theory under which Beltran's

attorney could invoke that personal right on his behalf. There is nothing in the record before us to indicate that Beltran knew his attorney had attempted to invoke those rights; based on the holding in *Moran,* a document of which Beltran apparently had no knowledge could not have operated to invalidate a voluntary waiver of the *Miranda* rights presented to Beltran at the time questioning took place.

Even had Beltran signed and been fully aware of the invocation, we would hold it to be invalid. In *McNeil* v. *Wisconsin, supra,* 501 U.S. 183, the United States Supreme Court held that the petitioner's invocation of his Sixth Amendment right to counsel at the initial hearing to set bail did not operate to also invoke his Fifth Amendment right to counsel. (*Id.* at pp. 173, 178 [111 S.Ct. at pp. 2206, 2209].) The court declined to adopt such a rule as a matter of public policy because the result would be that "most persons in pretrial custody for serious offenses would be *unapproachable* by police officers suspecting them of involvement in other crimes, *even though they have never expressed any unwillingness to be questioned.* Since the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good, society would be the loser. Admissions of guilt resulting from valid *Miranda* waivers 'are more than merely "desirable"; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.' " (*Id.* at p. 181 [111 S.Ct. at p. 2210], italics in original, quoting *Moran* v. *Burbine, supra,* 475 U.S. at p. 426 [106 S.Ct. at pp. 1143-1144].)

In a footnote, the high court rejected the notion that its ruling would "routinely be circumvented when, '[i]n future preliminary hearing, compe-tent counsel . . . make sure that they, or their clients, make a statement on the record' invoking the *Miranda* right to counsel. *Post,* at 184. We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'—which a preliminary hearing will not always, or even usually, involve. [Citations.] If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. *Most rights must be asserted when the government seeks to take the action they protect against.* The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation, *does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation,* with similar future effect. . . . It would remain intolerable that a person in custody who had expressed *no* objection to being questioned would be unapproachable." (501 U.S. at p. 182, fn. 3 [111 S.Ct. at p. 2211], italics added.)

The invocation filed by Beltran's attorney created the very situation the high court found to be intolerable. Counsel filed the invocation while Beltran was in custody but outside the context of interrogation, thus purporting to prophylactically assert rights against actions Beltran expected the government to take, but which had not yet occurred. But when the interrogation did take place, Beltran voluntarily waived his rights and expressed *no* objection to being questioned by police. By allowing defendants to prophylactically file blanket invocations of their rights, we would upset the balance of *Miranda* rights crafted by the United States Supreme Court, and create a situation in which police were effectively barred from questioning any represented defendant about any other crime, the very result avoided in *McNeil*.[4] In keeping with *McNeil,* to be effective, a suspect's invocation of his or her Fifth Amendment right to counsel must be asserted at the point when the suspect is in custody and interrogation by the police has begun, the point at which the suspect must be advised of his or her *Miranda* right to have counsel present during questioning. Once the Fifth Amendment right to counsel is properly invoked in that setting, the police may not interrogate that suspect further without counsel present. Because Beltran's purported invocation occurred outside the setting of custodial interrogation, it could not operate to invoke his Fifth Amendment right to counsel.

## III, IV*

. . . . . . . . . . . . . . . . . . . . . . .

## V

The judgment is affirmed.

Rylaarsdam, J., and Seymour, J.,† concurred.

Appellant's petition for review by the Supreme Court was denied January 13, 2000.

---

[4]Further, once a suspect was appointed counsel on a case, he or she could not be approached by the police again for questioning as to any future criminal conduct—clearly, an absurd result.

*See footnote, *ante*, page 425.

†Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.