[No. D054757. Fourth Dist., Div. One. July 24, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS BUSKIRK, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II, III and IV.

**COUNSEL**

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda Cartwright-Ladendorf and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, Acting P. J.**—A jury convicted Nicholas Buskirk of second degree robbery (Pen. Code,[1] § 211), but found the attendant firearm use allegation not true (§ 12022.5). Buskirk admitted he had served a prior prison term within the meaning of section 667.5, subdivision (b). The trial court sentenced Buskirk to a total prison term of six years.

Buskirk appeals, contending the trial court prejudicially erred in denying his motion to suppress his pretrial statements obtained in violation of the Fifth Amendment to the United States Constitution after he had invoked his right to counsel, in failing to instruct the jurors that a witness was an accomplice as a matter of law, and in failing to advise him of his *Boykin-Tahl*[2] rights before he admitted his prison prior was true. Buskirk also requests, and the People do not oppose, that this court review the sealed record of the in camera hearing conducted by the trial court regarding the testifying purported accomplice to determine whether any information should have been disclosed which would be relevant to her credibility as a witness and, if so, to permit him to file a supplemental brief on the question of prejudice due to the alleged erroneous nondisclosure by the trial court.

In the published portion of this opinion we determine Buskirk did not clearly and unequivocally invoke his right to counsel. In all other respects, we affirm.

### FACTUAL BACKGROUND

On April 22, 2007, a masked man pointed a black gun at Lillian Abrams and said, "Give me your purse, bitch," as she was getting into her car in the parking lot of the Stater Bros. markets shopping center in Twentynine Palms in San Bernardino County, California. Scared, Abrams handed her purse to the man and he fled across the parking lot and a major intersection to Cactus Drive where he jumped into the passenger side of a tan Mazda truck and crouched down in the seat. Two men, who were in a car in the parking lot and had observed the robbery and the assailant get into the truck on Cactus Drive, memorized the license plate number of the truck as it drove away before returning to assist the victim and call 911.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] *Boykin v. Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].

San Bernardino County (SBC) Sheriff Deputy Steven Everhart responded to the scene of the robbery where he interviewed Abrams and the witnesses, obtaining a general description of the suspect and his clothes, and a license plate number for the Mazda truck in which he fled. Based on the interviews, Everhart also collected recent shoe imprints in a dirt field the suspect had run across to reach the truck on Cactus Drive.

On April 30, 2007, SBC Sheriff's Detective James Thornburg, assisting in the followup investigation of the robbery, received information from another sheriff's deputy that there were two people involved in the crime, named Buskirk and Nicole Alexander, and that Alexander drove a tan Mazda pickup truck similar to the one seen by the witnesses the day of the robbery. When Thornburg ran a check on Alexander's vehicle registration, it came back "with a Mazda pickup truck with a license plate [number] that was extremely close to the ones written down by the witnesses of the robbery." Thornburg then located an address for Alexander on Henry Road in Wonder Valley, sent several deputies to confirm the address, authored a search warrant and executed it at that location the same day.

Buskirk was contacted by SBC Sheriff's Deputies Rick Millard and Jeffery Joling and subsequently arrested at the Henry Road address. During a search of the property, a pair of men's tennis shoes was found in Buskirk's mother's car that was parked in the driveway, and a black BB gun, a utility bill in Buskirk's name and a day planner with his name inside were found in the house. Thornburg, who was an expert in tracking, noted that the measurement and tread on the shoes was similar to the shoe print found at the robbery crime scene.

After Buskirk was transported to the Morongo Basin Sheriff's station, he waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*), initially denied any involvement in the robbery, but then changed his story after Thornburg told him that Stater Bros. had a surveillance video camera in the parking lot and that Alexander was in custody being interviewed. When Buskirk wanted a deal before talking further, Thornburg terminated the interview and walked Buskirk back to his cell. Although Buskirk expressed a desire at that time to again speak with Thornburg, the deputy told Buskirk he would have to come back later.

After Buskirk told another deputy at the jail that he wanted to talk again with Thornburg, Buskirk was interviewed again, but this time by SBC Sheriff's Detective Randy Warfield and Sergeant Jeff Joling. Buskirk admitted to Warfield that he had committed the robbery, but minimized his conduct, saying he used only a brown and black water pistol.

At Buskirk's trial, in addition to presenting the above evidence, Alexander testified, and the prosecutor played for the jury the redacted portions of Buskirk's interviews with Thornburg and Warfield.

Alexander, who had originally been charged as a codefendant in this case and had pled guilty to being an accessory after the fact and was awaiting sentencing, testified that according to her plea agreement she was to testify truthfully about the events surrounding the robbery. As background, she explained that she had met Buskirk while working at a Denny's restaurant and that he was good friends with both her and her husband, who was a Marine deployed overseas at the time of the robbery. On the day of the robbery, Alexander had spent the day with Buskirk, first having lunch at his mother's house and then running errands with him in Twentynine Palms in her tan Mazda pickup truck. At some point, she dropped Buskirk off at the Stater Bros. market shopping center so he could pick up medication for his mother at the Rite Aid store next to the market while she looked at some properties for rent on Cactus Drive, a street adjacent to the shopping center.

A short time later, as Alexander was stopped in her car writing down information from a rental sign, she saw Buskirk running down the street with his sweatshirt hood over his head. He jumped into the passenger side of her truck holding a purse, crouched down in the seat and told her to "go" and "not to stop" because he had just snatched a purse. She drove to some friends' house where, once inside, Buskirk rummaged through the purse and told her and the friends what had happened.

Later that evening, Alexander drove Buskirk back to her home on Henry Road. As she did so, Buskirk tossed some of the contents of the purse out the truck's window. Once they arrived at her house, Buskirk went into the backyard, doused the purse with lighter fluid and burned it in a fire pit.

About a week later, Alexander was contacted by sheriff's deputies and interviewed at the station house about the robbery. She initially lied about any involvement, but during a second interview admitted she drove the car in which Buskirk fled. Although Alexander conceded that Buskirk had talked in general about committing a robbery because he had done one before, she denied any knowledge that he was going to commit the robbery that day and denied planning to commit it with him. Alexander said that Buskirk had purchased the tennis shoes in evidence on the Friday before the robbery at a mall in Palm Springs and that he was in possession of a nine-millimeter handgun on the day of the robbery.

Sergeant Joling additionally testified about his encounter with Buskirk outside of Alexander's house, stressing that in spite of Buskirk's denial that the Henry home was his primary residence, his day planner and a utility bill in his name for that address were found during the search of the home that day.[3]

*The Defense*

On his behalf, Buskirk called Detectives Warfield and Thornburg as defense witnesses to further expound upon Alexander's evasiveness and untruthfulness during her interviews. He also presented the testimony of two volunteer workers at The Way Station, a Christian facility involved in providing food and clothing to the needy, who identified two food box slips dated April 26, 2007, one bearing Buskirk's name and the other with Alexander's name. One of the volunteers noted that The Way Station carried shoes similar to those in evidence that had been found with Buskirk at Alexander's house. The forms, however, did not indicate whether any clothing or shoes had been given along with the food to Buskirk or Alexander on April 26, 2007.

Buskirk additionally presented the testimony of a woman named Tanya Luke who had been driving on Cactus Drive near the time of the robbery. Luke saw a man wearing a hooded sweatshirt running down the street carrying a purse and headed toward a tan Mazda truck that was pulling away from the curb and driving east toward her on Cactus. Luke then saw the man run across the front of the car and get into the passenger side of the truck. As the truck passed Luke's car going the opposite way, she saw that the driver of the truck was a thin, White male, about six feet two inches tall, who was wearing a baseball cap. Although Luke was able to get a partial license plate number of the truck, which she gave to the 911 operator, she did not think the photograph of Alexander's truck in evidence depicted the same truck she saw that day.

## DISCUSSION

## I

## MOTION TO SUPPRESS BUSKIRK'S POSTARREST STATEMENTS

After the preliminary hearing in this case, Buskirk brought a motion to suppress his statements made after he was arrested at the house on Henry

---

[3] Although the parties characterize Joling's testimony as rebuttal, the record reflects it was presented out of order in the prosecution's case-in-chief.

Road for a parole violation and he asked for an attorney. At the hearing on the motion, after the court noted it had read the parties' respective papers, the following evidence was presented by the prosecution.

Detective Millard testified that he had gone with Sergeant Joling to Alexander's Henry Road residence on April 30, 2007, to obtain a physical description of the property for a search warrant regarding the robbery case. When they arrived, they unexpectedly saw Buskirk in the front yard, whom they recognized from earlier contacts and knew was on parole. Millard told Buskirk the officers were investigating a missing person's report and engaged him in idle conversation for about 10 minutes while confirming his identity, that Alexander lived at the residence, and her relationship with Buskirk. Most of that initial conversation was recorded.

Millard also recorded two other segments of conversation with Buskirk. He estimated about 11 minutes lapsed before he began recording the second portion, during which time Joling had contacted Buskirk's parole agent and had obtained permission to conduct a parole search of the residence. Millard decided to start recording again because Buskirk had become agitated and was talking about going to jail every time he had an encounter with the police. In addition to including more small talk, the second taped portion included Millard handcuffing Buskirk and telling him he was being arrested for a parole violation. When Millard told Buskirk in response to an inquiry that he would "find out" what his parole violation was later, Buskirk said, "Well, I want a lawyer. Right now." Millard made no attempt to clarify what Buskirk meant, but merely tried to calm him as Buskirk immediately began shouting questions at Joling about why he was being arrested, whether he could go into his friend's house, and generally denying that he lived at the residence. At some point, Joling held up a utility bill he had found in the residence and asked Buskirk why it was in his name. Joling also held up a BB gun found in the search, saying he thought it was Buskirk's gun. Joling, however, refused to answer any questions posed by Buskirk regarding his parole violation, telling him that he would have to talk to Millard about his *Miranda*[4] rights before asking the detectives any questions.

The third taped conversation began about three minutes later with Millard reading Buskirk his rights under *Miranda*, and Buskirk agreeing to speak with the detectives "depending on the circumstances." When Buskirk asked them why he was being investigated, the detectives told him they would inform him at the police station. Millard testified that he and Joling intentionally did not ask Buskirk any questions about the robbery case because they wanted to wait until they got to the police station to interrogate him.

---

[4] *Miranda, supra*, 384 U.S. 436.

Detective Thornburg then testified that he interviewed Buskirk at the sheriff's station after he read him his *Miranda* rights and Buskirk waived them without any hesitation and showed a willingness to talk. Although Buskirk initially denied any involvement in the robbery, toward the end of the interview he asked Thornburg "about his exposure if he, quote, copped to it." When Buskirk indicated he would not talk to Thornburg without a deal, the interview ended "abruptly," with Thornburg telling Buskirk he had no authority to make any deals with him. As Thornburg walked Buskirk back to the jail, Buskirk "requested that we go back to the room and talk again." Because Thornburg had other matters he needed to "take care of," he told Buskirk "[n]ot right now."

Later that day, Thornburg was contacted by SBC Sheriff's Detective Steve Wilson, the jail corporal, about Buskirk wanting to talk with Thornburg again. Thornburg then stopped by to see Buskirk at the jail and asked him what he wanted to talk to him about. When Buskirk "alluded to his case," Thornburg told him he was busy, but would come back "in a little while to get him and we would talk again." Subsequently, Thornburg returned to retrieve Buskirk and escorted him to the station's interview room.

On cross-examination, in response to questions as to whether Buskirk ever mentioned wanting a lawyer anytime during the interview after he had been read his rights under *Miranda*, Thornburg replied that there were several times he had "made reference to asking about an attorney." Thornburg explained that the first mention occurred when Buskirk became upset that another detective was in the room and said he would talk with Thornburg, "[b]ut if Detective Warfield was in the room, that he wanted an attorney." Warfield immediately left the room and Buskirk continued to talk to Thornburg. The other mention occurred as Thornburg was leaving the interview room, and Buskirk said, "I [need] a lawyer." Thornburg did not hear the request at that time because his back was to Buskirk. Thornburg only became aware of the request when he played back the videotape about six weeks later. No further questions were asked of Buskirk as Thornburg walked him back to the jail.

After the videotaped portion of the interview showing the second request was played for the court, it confirmed that Buskirk's request for an attorney was made while Thornburg was walking toward and opening the door to leave the interview room.

Detective Wilson testified at the motion hearing that while he was having some general conversation at the jail with Buskirk on May 1, 2007, whom he knew from previous contacts, Buskirk asked him to let Thornburg know that he wanted to talk to him. "[W]ithin 15 minutes or so," Wilson contacted Thornburg about the request.

Detective Warfield, who had been present for a portion of the interview with Buskirk earlier in the day and was the primary participant during the second interview at the station later that day, also testified at the motion hearing. Before any questioning at the second interview, Buskirk not only acknowledged to Warfield that he had been read his *Miranda* rights earlier by Thornburg, but also recited a significant portion of them, including his right to remain silent and his right to have an attorney present during or after questioning. Although Buskirk indicated he was willing to waive those rights and speak with Warfield, Warfield verified the facts that Buskirk had asked to talk with the detectives and that he understood he did not need to speak to them. No threats or promises of leniency were made to Buskirk before he waived his rights and talked with Warfield. During the interview, Buskirk admitted to Warfield that he was the assailant who had robbed the victim in the parking lot and also implicated Alexander in the crime.

In addition to entering into evidence the various transcripts and video recordings of the interviews with Buskirk, the prosecutor provided the court with a certified copy of Buskirk's rap sheet for the limited purpose of showing his familiarity with the criminal justice system due to his numerous contacts with law enforcement.

In argument on the motion, defense counsel stressed that Buskirk had asserted his right to counsel while he was in custody at the Henry Road residence, that there had been a violation of that right by the continued questioning of him without counsel, and that the violation was not cured by a subsequent advisement and waiver of his *Miranda* rights, either in the field or at the station interviews. Although counsel conceded that Buskirk had initiated the second station interview where he voluntarily made incriminating statements, counsel asserted those statements as well as any made in the first station interview must be suppressed because they were tainted by the earlier *Miranda* violation. The prosecutor disagreed, submitting that no *Miranda* violation occurred because Buskirk's request for an attorney at the time of his arrest for a parole violation was made "anticipatorily" before he was interrogated, he subsequently reinitiated contact with the detectives and waived his *Miranda* rights in the field before the first station interview, where he again validly waived his rights, and he also initiated the contact with the detectives before the second station interview.

After reiterating that he had reviewed "the moving papers, the responding papers, and the reply filed by [defense counsel]," as well as the relevant case law, the trial judge denied Buskirk's motion to suppress his postarrest statements, stating: "Starting with Mr. Buskirk. Some of the questions the court wanted answered were obviously the circumstances surrounding [his] request for an attorney when he made that request [when] he was told to put

his hands behind his back. And, yes, it's clear that at that time he was . . . in custody. [¶] [T]he court then turns to what was the nature of this arrest and what was told to Mr. Buskirk at that time. . . . And it's clear, in reviewing the transcripts and what we heard today, that what was related [to] Mr. Buskirk [was] that he was being taken into custody for a parole violation [about] which he continued to ask questions and more questions. [¶] So at that point . . . he then asked . . . specifically, 'What is my violation?' in response to him being placed on a parole violation. He was told, 'You'll find out.' And his response was, 'Well, I want a lawyer right now.' It appears to the court from those statements and the statements that continued on in that same transcript, including the . . . questions that he continued to ask, he continued to ask both detectives for a reasonable answer. And he was told if you want to ask more questions, you're going to have to . . . talk to Detective Millard about your *Miranda* rights first. That was stated by Detective Joling. It's clear in that regard to this court that it is analogous to the case of *People v. Nguyen* [(2005) 132 Cal.App.4th 350 [33 Cal.Rptr.3d 390]] in that his request for an attorney appeared to be specific as to his parole violation and being taken into custody for a parole violation at that time because that's all he had been told up to that point. [¶] The next issue that the court turns to then [is] the *Miranda* rights that were given to [Buskirk] at the station, and when he decided he didn't want to talk and he was taken back to the jail. It's clear in listening to the testimony of Detective Wilson that that contact was initiated by Mr. Buskirk. They were talking about nothing, but it seemed just like kind of passing conversation. . . . Detective Wilson wasn't investigating anything and the court found Detective Wilson to be honest, truthful, forthright. [A]t the request of Mr. Buskirk, [Wilson] informed the detectives' bureau that Mr. Buskirk wanted to have [an] additional opportunity to speak with them. And so I don't know necessarily that we even need to get into this being an anticipatory request for an attorney because the court, as it views the evidence presented, it seems like what Mr. Buskirk was requesting was a lawyer to advise him in his custody regarding a parole violation because it was made very clear to him that's why he was being taken into custody. [¶] In the *Edwards* case, [*Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880]], the *Miranda* warnings require [at] a minimum—some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. And the defendant, further, must ask for the particular sort of lawyerly assistance, that is the subject of *Miranda*. That's in the *McNeil* [*v. Wisconsin* (1991) 501 U.S. 171 [115 L.Ed.2d 158, 111 S.Ct. 2204]] case. And clearly at the point that he asked for a lawyer out in the field . . . when he was taken into custody for the parole violation, his request for an assistance of an attorney in dealing if this was going to be a custodial interrogation by the police was on that issue, of his arrest for a parole violation. And so the court finds that he was then not necessarily asking for a lawyer in [the] future,

which then would get us back to the anticipatory request for a lawyer, which would not be proper. [¶] On the other issue that the court heard evidence o[n] and asked to see the videotape, was where [Buskirk] again asked for a lawyer, and that was as Detective Thornburg was taking him out of the . . . interview room. And it was clear to the court that at the point that he asked for a lawyer, Detective Thornburg had stood up, had turned toward the door, and was opening the door when Mr. Buskirk said that he wanted a lawyer. Detective Thornburg . . . testified that he did not hear that statement. And so that was one of the reasons I wanted to see that videotape. Because as Detective Thornburg testified, it didn't appear that he was being anything but truthful. But obviously we had the evidence. That's the best evidence. So I was able to view that with counsel and Mr. Buskirk. And this court in viewing that . . . , it appears that Detective Thornburg was truthful, that he very easily did not hear that statement because they weren't facing one another. Detective Thornburg appeared to have been frustrated at that point, got up, and was saying this interview was over and was preparing to take the defendant out of the room. So the court doesn't find that there was a *Miranda* violation there either. [¶] And then, finally, at the request of Mr. Buskirk, he was brought back. He wasn't prodded into coming back and he was again reminded of his *Miranda* warnings. The court doesn't find that there was a *Miranda* violation even leading up to his final interview. So there wouldn't . . . be anything that would be tainted. [¶] In just reading the papers, it was a difficult decision. And leading up, I had no idea how I was going to rule on this. Now after hearing the evidence, viewing the tapes, listening to the evidence, the court finds under [*Edwards*] and *People v. Nguyen* that Mr. Buskirk's rights were not violated and the motion by the defense will be denied."

On appeal Buskirk contends the trial court erred "in finding that [his] invocation [of his right to counsel] was a legal nullity." He argues that all of his incriminating statements made after he invoked his right to counsel "in response to questioning regarding the robbery" while being arrested at the house on Henry Road must be suppressed under the dictates of *Edwards v. Arizona, supra,* 451 U.S. 477 (*Edwards*) and that this court should find their improper admission prejudicial error mandating reversal of his conviction. We conclude the trial court properly denied Buskirk's motion to suppress his statements made during the various interviews.

## A. *Pertinent Law*

The law is well established that "[w]hen reviewing a trial court's decision on a motion that [statements were] collected in violation of the defendant's rights under *Miranda, supra,* 384 U.S. 436, we defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that

resolution is supported by substantial evidence. [Citation.] Considering those facts, as found, together with the undisputed facts, we independently determine whether the challenged statement[s were] obtained in violation of *Miranda*'s rules [citation], that is, whether (assuming the defendant was in custody) the statement[s were] preceded by the now-famous admonition of *Miranda* rights: the defendant has the right to remain silent, any statement he might make can be used against him, he has the right to the presence of an attorney, and an attorney will be provided at state expense if he cannot afford one. [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 918 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

■ Once a custodial defendant has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards, supra*, 451 U.S. at pp. 484–485.) "If police officers subsequently question the suspect in counsel's absence, assuming there has been no break in custody, the suspect's statements are presumed involuntary even where the suspect waives his *Miranda* rights and voluntarily agrees to speak with investigating officers. This bright-line rule is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' [Citation.] The *Edwards* rule, moreover, is *not* offense-specific: Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, officers may not seek the suspect's permission to discuss other crimes unless counsel is present. [Citation.]" (*People v. Nguyen, supra*, 132 Cal.App.4th at p. 354 (*Nguyen*).)

■ However, the *Edwards* rule applies "only when the suspect 'has [clearly] expressed' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*. [Citation.] It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." (*McNeil v. Wisconsin, supra*, 501 U.S. at p. 178, italics omitted.) As the high court in *McNeil* observed, it had "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation' . . . ." (*Id.* at p. 182, fn. 3.) Thus, "in order for a defendant to invoke his *Miranda* rights the authorities must be conducting interrogation, or interrogation must be imminent." (*U.S. v. LaGrone* (7th Cir. 1994) 43 F.3d 332, 339; see also *Nguyen, supra*, 132 Cal.App.4th at p. 357; *People v. Beltran* (1999) 75 Cal.App.4th 425, 432 [89 Cal.Rptr.2d 267]; *People v. Calderon* (1997) 54 Cal.App.4th 766, 770–771 [63 Cal.Rptr.2d 104].) Although a defendant is not required to wait until a formal *Miranda* admonition before invoking the right to counsel, the circumstances must be such that the custodial defendant could reasonably conclude that interrogation is pending or imminent (*Nguyen, supra*, 132 Cal.App.4th at p. 357) and that a reasonable

officer would know that the defendant's request for counsel was unequivocal for purposes of the interrogation (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1123–1125 [23 Cal.Rptr.3d 295, 104 P.3d 98]).

Because "[i]t is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation" (*Illinois v. Perkins* (1990) 496 U.S. 292, 297 [110 L.Ed.2d 243, 110 S.Ct. 2394]), "the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect *in custody is subjected to interrogation.*" (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300 [64 L.Ed.2d 297, 100 S.Ct. 1682], italics added.) Interrogation consists of express questioning or words or actions on the part of the police that "are reasonably likely to elicit an incriminating response from the suspect." (*Id.* at p. 301, fn. omitted.) In other words, " '[t]he police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 993 [108 Cal.Rptr.2d 291, 25 P.3d 519].) "In deciding whether police conduct was 'reasonably likely' to elicit an incriminating response from the suspect, we consider primarily the perceptions of the suspect rather than the intent of the police. [Citations.]" (*People v. Davis* (2005) 36 Cal.4th 510, 554 [31 Cal.Rptr.3d 96, 115 P.3d 417].)

B. *Analysis*

■ Here, Buskirk's motion to suppress his postarrest statements was premised on three separate encounters with sheriff's detectives, first at the Henry Road residence where he was arrested for a probation violation; second, at the station with Thornburg after waiving his *Miranda* rights; and third, again at the station with Warfield after initiating the interview and waiving his rights. Buskirk essentially argues that regardless of his incriminating statements coming only in the last two interviews and the majority of them in the third one, which he freely initiated,[5] they should be suppressed because all encounters with the detectives were tainted after he invoked his right to counsel when he was being arrested at the Henry Road residence. However, we agree with the trial court's conclusion that as to the first encounter, Buskirk's saying he wanted a lawyer in response to being handcuffed and taken into custody for a parole violation was not a clear, unequivocal assertion he desired counsel to deal with custodial interrogation by the detectives.

Similar to the situation in *Nguyen, supra*, 132 Cal.App.4th 350, where the defendant there told the officers she was calling her attorney as she was being

---

[5] None of Buskirk's statements made during the Henry Road encounter were entered into evidence at trial.

arrested, although the defendant was then in custody, there was no indication an attorney's assistance was being sought to help with impending police interrogation. (*Id.* at p. 357.) Quite simply, at the time Buskirk was arrested at the Henry Road home, even though he was in custody, he was not being interrogated by the officers. Contrary to Buskirk's representation in his opening brief on appeal that he invoked his right to counsel "in response to questioning regarding the robbery," the record reflects that no questions were asked of him by the detectives regarding the robbery during the Henry Road encounter even after he continued to question them about why his parole was being violated and Millard subsequently read him his rights under *Miranda*. Consequently, because no *Miranda* violation occurred during the first encounter when Buskirk was placed into custody, the subsequent station interviews were not tainted.

Further, with regard to those interviews, we accept the trial court's findings that Thornburg and Wilson were credible, its resolution of the factual issue regarding Buskirk's request for an attorney that Thornburg did not hear at the end of the first station interview, and its implied finding that there was no police pressure placed on Buskirk to participate in the second station interview. Buskirk does not challenge that he voluntarily waived his rights under *Miranda* during the station interviews and initiated the second station interview in which he freely admitted that he had committed the Stater Bros.'s parking lot robbery. Thus, even assuming there had been a *Miranda* violation at the time of his arrest on the parole violation, Buskirk would be hard pressed on this record to show under *Edwards, supra*, 451 U.S. at pages 484 to 485, that the second station interview was tainted. As to the first interview, an independent review of the record reveals that although Buskirk did not initiate it, he voluntarily continued to talk with Thornburg after the detective stopped questions until Warfield left the interview room pursuant to Buskirk's conditional request for counsel if Warfield were to stay. At no time did Buskirk unequivocally express a desire for the assistance of counsel in dealing with the questioning by the detectives even though he was given the opportunity to do so when advised of his *Miranda* rights three times. In sum, the court properly denied Buskirk's motion to suppress his postarrest statements made during his interviews.

II–IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1436.

## DISPOSITION

The judgment is affirmed.

O'Rourke, J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 28, 2009, S175671.