Filed 2/24/22  P. v. Ives CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JOHN HAROLD IVES,<br><br>     Defendant and Appellant. | B304492<br><br>(Los Angeles County<br>Super. Ct. No. TA148467) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Allen J. Webster, Judge.  Affirmed.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

A jury convicted John Harold Ives of sexually abusing his daughter over a period of several years. On appeal, Ives argues that the trial court's admission of his statements made during a custodial interrogation violated *Miranda v. Arizona* (1966) 384 U.S. 436 and the prosecutor committed reversible error in her closing argument when she misstated the law on sexual intercourse by telling the jury that a penis "hitting" a vagina, or the lips of vagina, is sexual intercourse and rape on a child. We affirm the judgment.

## BACKGROUND

### I.    The sexual abuse

Ives sexually abused his daughter over a period of five or six years when she was between the ages of five and 11 years old. The abuse occurred approximately one to three times per week or five times per month while daughter was in Ives's care and mother was at work.

When daughter was five to six years old, Ives would place his hands under daughter's clothes and insert his fingers into her vagina and touch her chest. On other occasions, Ives would force daughter to kneel in front of him and touch his penis while he placed his hands in her pants and touched her vagina. Daughter said this caused pain and "felt like scratching." Daughter would tell Ives to stop, but he refused. Ives also forced daughter to perform oral sex on him.

When daughter was seven years old, Ives would put his fingers in daughter's vagina and force her to touch his penis and perform oral sex. On one occasion, Ives forced daughter to kneel in front of him while he sat on the couch and perform oral sex on him until he ejaculated into her mouth. This made her gag and feel disgusted.

2

When daughter was eight years old, the sexual abuse escalated.  While daughter was in bed, Ives would hold her legs up and try to insert his penis in her vagina.  Because Ives's penis would not fit, he moved it back and forth between the lips of daughter's vagina.

When daughter was nine or 10 years old, she was asleep in her mother's bed when she was awakened by a flash of light and heard the clicking sound of a phone camera.  Daughter noticed that the bed covers and her pants had been removed and that Ives was taking pictures of her while his fingers were in her vagina.  In a separate incident, Ives asked daughter to watch television with him on the couch.  Daughter sat down with Ives and he turned off the television and put his hand in her pants and put his fingers in her vagina.

Ives told daughter not to tell anyone about what he did to her or bad things would happen to him.  Daughter feared Ives and testified that, once when she was in elementary school, Ives held a meat cleaver against her neck and yelled at her.  Other times, Ives hit daughter and told her that she was a "mistake" and she "should never have been born."

Daughter did not disclose the sexual abuse until she was 15 years old when she told her high school teacher.  The teacher reported the sexual abuse to a school administrator, who notified the Department of Children and Family Services.

## II.    Pretext text messages and phone calls

Detective Tifani Stonich interviewed daughter at her school.  Detective Stonich explained to daughter how sexual abuse investigations occur and proposed that daughter make a pretext call to Ives to see what he would say regarding the sexual abuse.  Daughter did not feel comfortable calling Ives, but agreed

3

to send him a text message.  She sent a text message to Ives, stating, "Because I want to fix us, but I am struggling with something that I can't get off my mind.  And you're the only one I can talk to about it.  I can't stop thinking about when I was younger you had me touch you and when you would touch me."[1]

Ives sent a text message to daughter that said, "That stuff is difficult to talk about, too, for me."  He then texted, "Wish it never happened.  Try to forget about it.  Make some mistakes. I've asked God to forgive me.  I go to church now.  Anyway, my break is over.  I have to go now.  Contact you at 4:30."  Daughter responded with, "I just want to hear you apologize for what you've done.  The memories of making me give you oral sex and touching your penis and you touching my vagina and trying to have sex with me multiple times."  Ives texted back, "Please forgive me for the mistakes I made.  I have no experience before you at being a dad."  Daughter responded, "I'm ready to forgive you once you tell me exactly what you are sorry for.  I'm not crazy, dad.  Those things did happen, didn't they?"  Ives responded, "I'm sorry."

Shortly thereafter, daughter made a pretext call to Ives. Detective Stonich was present during the call and the call was recorded.  Ives made numerous incriminating statements during the call.

"I[ves:]  I'm sorry for touching you inappropriately. [¶] . . . [¶]

"[Daughter:] . . . Did I lose my virginity to you?

---

[1] The People introduced screenshots of the text message exchanges and daughter read them to the jury.

"I[ves:]  I [unintelligible] virgins.  I never put—I never put that in there.  [¶] . . . [¶]

"[Daughter:]  I remember you putting your penis in me.

"I[ves:]  No, it never went inside.  [¶] . . . [¶]

"[Daughter:]  Okay.  I remember it happening and you trying to.

"I[ves:]  Okay.  I remember, too.  But I'm sorry—[¶] . . . [¶]

"I[ves:]  I wish I never—I wish I could go back—turn back time and not do it.  [¶] . . . [¶]

"I[ves:]  I was—I was an—I was an idiot for doing . . .

"[Daughter:]  Can you promise me that—

"I[ves:] . . . Can I what?

"[Daughter:]  —me touching your penis and you[ ] having me touch you very inappropriately will never happen again?

"I[ves:]  Yes.  I promise that will never happen again."

When daughter asked why Ives made her perform oral sex on him, Ives stated, "I was perverted.  I was looking at a lot of porn at the time" and "I was crazy with porn."  Just before the call ended, Ives said, "I feel terrible for what I did to you."

## III.   Ives's interview with detectives

Detective Stonich and her partner, Detective Chris Waller, interviewed (and tape recorded) Ives the day following his arrest.[2]  Ives was in custody but not handcuffed; he was provided food and water.  The detectives confronted Ives about the allegations that daughter had made against him.  They told him they had read the text messages between him and daughter and that they were present during the pretext call.  Ives stated, "I

---

[2] An audio recording of the interview was played to the jury.

deeply—I deeply regret (phonetic) what has happened" and that he "screwed up."

When Detective Stonich told Ives that daughter claimed that the sexual abuse occurred from the time she was six to 11 years old, Ives said, "I don't remember that long. [¶] . . . [¶] . . . A lot less than that." He claimed that the inappropriate touching "was maybe a couple of encounters, that was it" and that daughter had "a tendency to exaggerate things." He admitted that the sexual abuse started when daughter was in elementary school.

Ives denied that daughter gave him oral sex and that he put his fingers in her vagina, but admitted that he rubbed the outside. He also denied performing oral sex on her and denied that he tried to put his penis inside of her vagina. These initial denials notwithstanding, Ives claimed that daughter enjoyed it when he performed oral sex on her and that sometimes she would voluntarily initiate performing oral sex on him when her mother was sleeping or at work.

Ives did not present evidence in his defense.

## IV.    Verdict and sentence

The jury found Ives guilty of six counts of committing a lewd act upon a child under 14 years old (Pen. Code,[3] § 288, subd. (a); counts 1, 3, 5, 7, 10, 13); five counts of oral copulation or sexual penetration with a child 10 years old or younger (§ 288.7, subd. (b); counts 2, 4, 6, 8, 11); two counts of sexual intercourse or sodomy with a child 10 years old or younger (§ 288.7. subd. (a); counts 9, 12); one count of sexual penetration by use of force with

---

[3] All undesignated statutory references are to the Penal Code.

a victim under 14 years old (§ 289, subd. (a)(1)(B); count 14); one count of aggravated sexual assault of a child under 14 years old by sexual penetration (§ 269, subd. (a)(5); count 15); and one count of aggravated sexual assault of a child under 14 years old by oral copulation (§ 269, subd. (a)(4); count 16).

The trial court sentenced Ives to 165 years to life in prison. Ives timely appealed.

## DISCUSSION

### I. *Miranda* violations

#### A. *Additional facts*

##### 1. **Ives's police interview**

Ives was arrested at work and spent the night in jail before he was interviewed by detectives. Detectives Stonich and Waller interrogated Ives for approximately 45 minutes.

During the interrogation the following exchange took place:[4]

"S[tonich:] . . . Okay. Um, when they arrested you, did they tell you why you were arrested? They—did they tell you like, um—

"I[ves:] . . . At first, they said warrant out of Los Angeles, and then—

"S[tonich:] . . . Right.

"I[ves:] —when I got—when they took me from my work to Van Nuys station—

"S[tonich:] . . . Um-hm.

"I[ves:] —to L.A. County Sheriff, then they told me I had a warrant for, uh, lewd conduct.

---

[4] This account of Ives's interrogation was taken from a transcript of the audio recording.

7

"S[tonich:] Okay. And then they tell you, like you have the right to remain silent, anything you say can and will be used against you court— [¶] . . . [¶]

"I[ves:] . . . Nobody read my rights. [¶] . . . [¶]

"S[tonich:] You have the right to an attorney during questioning. If you can't afford an attorney during questioning, one will be appointed to you. Did they tell you any of that?

"I[ves:] No.

"S[tonich:] Okay. Um, and then they didn't really go into details of why you were here or—

"I[ves:] . . . No.

"S[tonich:] —any of that. Okay.

"I[ves:] They just cuffed me and stuffed me.

"S[tonich:] Okay. Um, I'm sorry for that, but we're here to explain all that to you."

No further explanation or reading of *Miranda* rights followed and the detectives continued questioning Ives. After Ives initially denied the sexual abuse allegations, the detectives informed him that they had read the pretext messages between him and daughter and were present during the pretext call. At that point in the interview, Ives inquired about getting an attorney.

"I[ves:] Should I get a lawyer?[5]

"S[tonich:] No problem. Is this conversation done? Do you have any other questions for me, or would you like to—

_____

[5] On cross-examination, after this portion of the recording was played, defense counsel asked Detective Stonich if Ives said "[c]an I get a lawyer[ ]" (rather than "[s]hould I get a lawyer[ ]"). Detective Stonich replied, "It's hard for me to understand. But I could see where you would say—I could hear can."

"I[ves:] . . . What else did she say?  What—

"S[tonich:] . . . Well, if you want a lawyer, John, I can't tell you—

"I[ves:] . . . Were you with her all day yesterday?

"S[tonich:]  John, if you are asking for a lawyer, we have to end this conversation.

"I[ves:]  Okay.  But, uh, can I ask a couple of questions before I ask for the lawyer?

"[Waller:]  No.

"S[tonich:]  No.  The thing is, is what—like I explained to you when I first got here, we could talk, and at any point you want an attorney, you can have an attorney.  That's why I kind of went over those—

"I[ves:] . . . Okay.  Why is my bail a million dollars?

"S[tonich:]  Well, I can ask—I can answer that very factually.  Because of what the conduct is.

"I[ves:]  Um . . .

"S[tonich:]  Everything I told you.  Oral sex—you to her—

"I[ves:] . . . How much time—

"S[tonich:]  —her to—

"I[ves:]  —am I looking at?

"S[tonich:]  That's all—here's the thing.  That's why I wanted to talk to you.  I wanted to understand you, John.  I want to understand what—what's going on, and to see where we could go with this.  That's what I want to know, but if you're saying hey, it's not me, I didn't do it—"

Ives proceeded to make damning admissions of multiple instances sexually abusing daughter.

9

## 2. Motion to exclude Ives's statements in violation of *Miranda*

The court held an Evidence Code section 402 suppression hearing at which Detective Stonich testified that after asking Ives a few preliminary questions, she advised him as follows:

" . . . You have the right to remain silent.

"Anything you say can and will be used against you in a court.

"You have the right to have an attorney present during questioning.

"If you can't afford an attorney, one will be appointed to you."

Detective Stonich testified Ives "appeared to understand" his rights, but she also conceded she did not expressly ask him if he understood and waived them and was willing to talk.

The trial court denied the suppression motion, ruling that Detective Stonich properly advised Ives of his *Miranda* rights and that Ives waived those rights by continuing to ask questions after he asked for a lawyer. The trial court stated, "So it just seems to me, based upon the totality of the circumstances, that this was an effective advisement of the *Miranda* rights and it was an implied waiver. And there was no real request for an attorney, but it was just kind of like a question. And then Mr. Ives continued to talk. [¶] . . . [¶] And, again, the detective basically indicated if that's what you want, we got to stop talking. He kept talking. So I just basically think . . . that the *Miranda* rights were effective." "It was an implied waiver. And there was nothing in here that suggested that Mr. Ives really requested an attorney."

10

**B.**   *Standard of review*

"'To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the "inherently compelling pressures" of custodial interrogation [citation], the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation [citation].' [Citation.]  A suspect who has heard and understood these rights may waive them.  [Citations.]  '[T]he prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation.' [Citations.]  This analysis requires an evaluation of both the defendant's state of mind and circumstances surrounding the questioning." (*People v. Leon* (2020) 8 Cal.5th 831, 842–843.)

When reviewing a trial court's ruling on a claimed *Miranda* violation, we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.  (*People v. Leon, supra*, 8 Cal.5th at p. 843.) We review independently the trial court's legal determinations of whether a defendant's *Miranda* waivers were knowingly, intelligently, and voluntarily made, and whether his reference to a lawyer constituted an unambiguous invocation of the right to counsel.  (*People v. Rundle* (2008) 43 Cal.4th 76, 115; *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.)

**C.**   *Forfeiture*

The People argue that Ives's challenge on appeal to the sufficiency of the *Miranda* warnings has been forfeited because he failed to raise the same arguments below.  While defense

11

counsel challenged the admissibility of Ives's statements under *Miranda*, he focused primarily on whether Ives's waiver was knowing and intelligent, arguing that the detectives kept the conversation casual and did not read the *Miranda* warnings from a card.  On appeal, Ives contends that the detectives did not advise him of his *Miranda* rights at all and relies on a portion of the transcript of the audio recording of his interview that was not considered by the trial court.  Ives concedes that the relevant portion of the transcript was not before the trial court, but asks us to consider his argument on the merits to avoid an ineffective assistance of counsel claim.

While it is well established that in reviewing a trial court's suppression ruling, the appellate court will "consider only the evidence that was presented to the trial court at the time it ruled" (*In re Arturo D.* (2002) 27 Cal.4th 60, 77, fn. 18; *People v. Moore* (2006) 39 Cal.4th 168, 171), we may consider an issue on the merits to avoid an ineffective assistance of counsel claim (*People v. Mattson* (1990) 50 Cal.3d 826, 854).

We conclude that such consideration is warranted here.  Notably, the People do not dispute that the transcript of Ives's police interview is a more accurate account of what happened.  Rather, the People only contend that the relevant portion of the transcript was not presented to the trial court and thus should not be considered here.  However, because there is no possible legitimate tactical reason for failing to bring this evidence to the trial court's attention, Ives would have a meritorious ineffective assistance claim.  The transcript shows that Detective Stonich's testimony at the suppression hearing that she advised Ives of his *Miranda* rights was inaccurate and that his rights were only mentioned in passing and in the context of Ives's arrest.  Trial

12

counsel thus failed to impeach a key witness and preserve the appellate record.  Under these circumstances, we find it appropriate to reach the merits of Ives's *Miranda* argument.

**D.** **_Ives was not adequately advised of his_ Miranda _rights._**

Based on our review of the record, including the transcript of the audio recording of Ives's police interview, we conclude that the detectives did not adequately advise Ives of his *Miranda* rights.

There is no dispute that the detectives began questioning Ives without first advising him of his rights.  Detective Stonich merely inquired whether arresting officers' advised Ives of his *Miranda* rights.  The detectives did not inform him of his right to remain silent, that any statements he made during the interview could be used against him in court, or that he had the right to an attorney.  The detectives merely referred to these rights in the context of questions regarding Ives's arrest.  These references were not a fully effective equivalent of *Miranda* warnings. (*Duckworth v. Eagan* (1989) 492 U.S. 195, 202.)  They did not meet the requirement that "prior to the initiation of questioning, they must fully apprise the suspect of the State's intention to use [the suspect's] statements to secure a conviction, and must inform [the suspect] of [the] right[ ] to remain silent and to 'have counsel present . . . if [the suspect] so desires.' " (*Moran v. Burbine* (1986) 475 U.S. 412, 420.)  Further, although Detective Stonich testified that she advised Ives of his rights, this is not supported by the transcript of the interview, which the People do not dispute is a more complete recitation of Detective Stonich's advisements.

13

We conclude that the detectives failed to comply with *Miranda* and Ives's statements should have been excluded. Nevertheless, as we explain below, we conclude that the erroneous admission of those statements was harmless.

**E.     *The error was harmless.***

"The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24). [Citation.] That test requires the People 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to defendant had [the] statements not been admitted.' [Citation.] Because confessions ' "[a]lmost invariably" will provide persuasive evidence of a defendant's guilt . . . , the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-error standard.' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.)

Ives argues the admission of his interview with the detectives was error requiring reversal under *Chapman* because the "incriminating statements [in the interview] played a starring role in the prosecutor's case against him." He contends that the prosecutor's "detailed" and "heavy" reliance on the interview makes it "impossible to say" that its introduction was harmless beyond a reasonable doubt. We disagree.

Although Ives's interview with police was highly incriminating, the remaining evidence against Ives was overwhelming and supported the numerous counts against him

14

for sexual abuse. At trial, daughter described repeated instances of sexual abuse with little cross-examination and no significant impeachment. In his cross-examination of daughter, defense counsel focused on daughter's relationship with Ives and her potential bias, but did not otherwise elicit testimony that the sexual abuse did not occur.

The prosecution also introduced the pretext phone call and text messages in which Ives admitted to sexually abusing daughter. In one of the text messages, daughter confronted Ives about touching her inappropriately when she was younger; he said that he wished it never happened and that she should try to forget about it. Rather than deny that he made daughter give him oral sex, that he touched her vagina, that he tried to have sex with her, or that he made her touch his penis, Ives asked her forgiveness for "mistakes" he made and blamed his own inexperience as a father. During the pretext phone call, Ives told daughter, "I'm sorry for touching you inappropriately." After daughter repeatedly asked if she lost her virginity, Ives replied, "I never put—never put that in there" and "it never went inside." When daughter told Ives that she remembered him trying to put his penis inside her vagina, he said, "Okay. I remember, too. But I'm sorry." Finally, when daughter made Ives promise to never make her touch his penis again, he said, "Yes. I promise that will never happen again." Thus, even without Ives's interview, his own admissions that he sexually abused daughter corroborated her testimony and were extremely incriminating. There is no claim that, apart from the challenged interview, there is not substantial evidence to support the convictions. Ives does not identify any statement in that interview that is substantially

15

different from what is contained in the pretext calls and messages.

Ives does not argue, nor do we find, that the interview supplies the sole evidence of any element of any offense of which Ives was convicted. Instead, Ives's claim of prejudice focuses almost entirely on the incriminating nature of the interview, rather than on the strength of the remaining evidence introduced at trial.

An analysis of prejudice requires an evaluation of the strength of daughter's numerous statements regarding the offenses, both before and at trial, and an objective examination of any evidence arguably impeaching these statements. (See *People v. Cahill* (1993) 5 Cal.4th 478, 493 [whether erroneous admission of confession was prejudicial must be determined in the context of all of the evidence received at trial].) Our review of the record reveals nothing that would cast doubt about daughter's credibility. Daughter's trial testimony was powerfully corroborated by the pretext calls and text messages and the initial reports of abuse to the school and the detectives. The challenged interview did not provide corroboration different in kind or degree. (See *People v. Asay* (1990) 224 Cal.App.3d 608, 619 [admitting improper confession was not prejudicial when a properly admitted confession contained same details about crimes].) Based on the overwhelming evidence of Ives's guilt, we conclude any erroneous admission of his statements was harmless beyond a reasonable doubt.

## II. Closing argument

Ives argues that the prosecutor misstated the law on sexual intercourse by misleading the jury on what constitutes penetration.

16

During closing argument, the prosecutor stated, "And ladies and gentlemen, according to the law, any time there is a penis entering into a vagina, that is vaginal intercourse, okay. Now, but since the charge is [section] 288.7, having sexual intercourse with a child 10 years or younger, any time that penis hits her vagina, the lips of vagina, that is rape on a child, okay. That is rape on a child." Defense counsel objected that this was a misstatement of law. The trial court admonished the jury that counsel's argument was not evidence, and the jury instructions would provide them with the applicable law before they start deliberations. The prosecutor resumed argument, stating, "So when his penis is hitting her vagina, it is going past the lips of her vagina. It didn't have to go all the way in. But it is hitting it and it is going past the lips of her vagina."[6]

## A.    *Applicable legal principles*

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' [Citations.] To establish such error, bad faith on the prosecutor's part is not required." (*People v. Centeno* (2014) 60 Cal.4th 659, 666.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable

_____

[6] As noted, the trial court instructed pursuant to CALJIC Nos. 1045, 1123, 1127, and 1128 that penetration required for the relevant sex offenses need only be "slight."

17

likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.) "If the challenged comments, viewed in context, 'would have been taken by a juror to state or imply nothing harmful, [then] they obviously cannot be deemed objectionable.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 130.) A defendant's conviction will not be reversed for prosecutorial misconduct that violates state law unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071.)

**B.** *Analysis*

We think the prosecutor's statement about rape in the context of the evidence presented in the case was not improper. First, the prosecutor explained that "when his penis is hitting her vagina, it is going past the lips of her vagina. It didn't have to go all the way in. But it is hitting it and it is going past the lips of her vagina."

Secondly, the prosecutor was clearly attempting to make the distinction between vaginal penetration, which would be physically difficult with a young child, and the degree of penile insertion or contact required for conviction under the law, which is "slight penetration." It is not improper to make such a distinction to laypersons on a jury who might be confused with the kind of vaginal penetration commonly associated with rape of an adult.

18

Additionally, daughter testified that Ives had put "the tip of his penis . . . slightly in between the lips of [her] vagina"; that he "just put his penis between the lips of [her] vagina; that she "would only let the tip of his—the end of his penis move back and forth between the lip of [her] vagina; that he was "putting his penis between the lips of [her] vagina; and that Ives "would rub his penis between the lips of [her] vagina." These statements, as well as others in the record, provide the factual context in which the prosecutor made her statement about Ives's penis "hitting" daughter's vagina.

The prosecutor was clearly referencing testimony that suggested something other than "hitting," as that term is colloquially used. However, as noted above, the prosecutor explained what she meant in using the term and never argued that a mere touching of the vaginal lips constituted rape.

Finally, the court clearly informed the jury that argument of counsel is not evidence and reminded them that the jury instruction that applied would be provided to them during deliberations. Jurors are presumed to follow the instructions they are given. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

We find no prosecutorial misconduct, and even if we did, there was no prejudice under any standard, including *Chapman v. California, supra,* 386 U.S. 18.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

VIRAMONTES, J.*

We concur:

EDMON, P. J.

LAVIN, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.